**BASIC FUN, INC. Plaintiff,**

v.

**X–CONCEPTS, LLC and Wormtrap, Inc. d/b/a Alien Workshop Defendants.**

**No. CIV. A. 00–2208.**

United States District Court, E.D. Pennsylvania.

June 6, 2001.

Gary A. Rosen, Akin Gump Strauss Hauer & Feld, Patrick Madamba, Jr., Akin

Gunp Strauss Hauer & Feld, LLP, Philadelphia, PA, for Basic Fun, Inc., Plaintiffs.

Joshua Horn, Fox, Rothschild, O'Brien & Frankel, Scott L. Vernick, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, Craig I. Celniker, Morrison & Foerster LLP, Robert M. Harkins, Richard C. Kim, Charles S. Evendorff, San Diego, CA, Robert M. Cavalier, Lucas and Cavalier, Phila, Thomas J. Intili, Intili & Graham, Dayton, OH, for X–Concepts, LLC, Wormtrap, Inc., (doing business as Alien Workshop), Defendants.

### MEMORANDUM AND ORDER

TUCKER, District Judge.

Presently before this Court is a Motion for Preliminary Injunction (Document No. 17) filed by Defendant X–Concepts, LLC ("X–Concepts") on September 29, 2000, and joined by Defendant Wormtrap, Inc. doing business as Alien Workshop ("Wormtrap") on December 12, 2000 (Doc. 36). For the reasons set forth below, upon consideration of the motion, the Opposition of Plaintiff Basic Fun ("BFI") (Doc. 27), Defendant X–Concepts' Pre–Hearing Statement in Support of Its Motion (Doc. 37), the transcripts of preliminary injunction hearing of December 13–14, 2000 (Docs. 44 and 45), and the Proposed Findings of Facts and Conclusions of Law from Plaintiff (Doc. 47), Defendant X–Concepts (Doc. 48), and Defendant Wormtrap (Doc. 49), this Court grants the motions for a preliminary injunction.

### FINDINGS OF FACTS

1) Wormtrap, Inc., doing business as Alien Workshop ("Alien"), owns and has registered the trademarks "Alien Workshop" and several graphics, including the "Triad" logo that shows three aliens in a rounded triangle. *See* Exhibit A19 (Trademark registrations); and Hearing Trans., Vol. I ("HT I") 107:13–18, 150:10–151:4 (C. Carter).

2) Wormtrap also has registered copyrights in the Triad design artwork and in three skateboard designs that are the subject of the motion for preliminary injunction. *See* Exhibits A1–A4 (Copyright registrations); and HT I 108:4–111:2 (C. Carter).

3) By agreement dated December 17, 1998, Wormtrap exclusively licensed to X–Concepts the right to manufacture miniature skateboards with the Alien graphics (the "Alien/X–Concepts Agreement"). *See* Exhibit X3 (Alien/X–Concepts Agreement); HT I 36:12–37:13 (P. Asher); and HT I 113:14–115:24 (C. Carter).

4) By the terms of the Alien/X–Concepts Agreement, Alien retained no right to use or grant licenses to others to use the Alien graphics for use on miniature skateboards. *See* Exhibit X3 (Alien/X–Concepts Agreement).

5) Danny Way, a California resident, is a professional skateboarder endorsed and sponsored by Wormtrap. Under their sponsorship agreement, Danny Way uses Alien Workshop® skateboards exclusively in competition and during public appearances. *See* HT I 111:12–25; 112:1–3 (C. Carter).

6) Stephen Astephen, also a California resident, is Danny Way's promotions agent. *See* HT I 118:18–25 (C. Carter).

7) At all relevant times, Astephen acted as agent for Trinity in the negotiation and performance of the Alien/Trinity Agreement. *See* HT II 46:3–47:20 (B.Stein); and Deposition of Stephen Astephen ("Astephen Depo."), 24:10–25:12. HT I 121:15–125:25, 175:6–13

(C. Carter). *See* HT II 46:3–47:20 (B.Stein).

8) In or about early 1999, Stephen Astephen approached Chris Carter, Wormtrap's president, about licensing Alien Workshop ® skateboard designs for a product called the "Official Danny Way Skateboard Keychain." *See* HT I 121:22–25; 122:1–10 (C. Carter).

9) In response to Astephen's inquiry, Carter informed Astephen of Wormtrap's license agreement with X–Concepts and told Astephen that Wormtrap could not license Alien Workshop ® board designs for use on a product which would compete with X–Concepts' Tech Decks ®. *See* HT I 122:13–19 (C. Carter).

10) Astephen assured Carter that the "Official Danny Way Skateboard Keychain" was a key chain and not a Tech Deck ®; whereupon Carter concluded that Astephen's intention was to use Wormtrap's designs on a charm, which would be affixed to a key ring with a chain. *See* HT I 124:20–25 (C. Carter).

11) On April 30, 1999, at Astephen's request, Wormtrap executed a "Corporate Logo Usage Agreement" with Trinity Marketing, Inc., a Pennsylvania corporation headquartered in Southampton, Pennsylvania. *See* Exhibit BF–7.

12) Wormtrap gave a conditional license to Trinity to sublicense to BFI the right to make keychains with Alien graphics for free, conditioned upon Trinity obtaining Alien's written approval of the final package and product and the use of its logo and graphics on the package and product (the "Alien/Trinity Agreement"). *See* Exhibit BF7 (Alien/Trinity

Agreement); and HT I 123:8–25 (C. Carter).

13) The right to written approval of the final package and product was crucial to Wormtrap in order to ensure that the presentation of its graphics on the BFI product did not infringe on X–Concepts' rights and to comply with its right and duty to control the nature and quality of the product and packaging bearing its trademark. *See* Exhibit BF7 (Alien/Trinity Agreement); HT I 123:8–25; 124:16–125:25; 152:15–153:2 (C. Carter).

14) Wormtrap's intent in executing the Corporate Logo Usage Agreement was to enable Astephen and Trinity Marketing to develop the "Official Danny Way Skateboard Keychain" for Wormtrap's approval. *See* Exhibit BF–7.

15) Under Section 1(C) of the Corporate Logo Usage Agreement, neither Trinity, nor any licensee of Trinity, was permitted "to enter into the final manufacture or distribution of the ['Official Danny Way Skateboard Keychain'] until final approval of name, logo & graphics [was] *approved in writing* by Alien Workshop for package & product." *See* Exhibit BF–7 (emphasis added).

16) In Sections 1(D) and 1(E) of the Corporate Logo Usage Agreement, Trinity indicated that the Official Danny Way Skateboard Keychain would be manufactured, distributed and sold, if at all, by BFI. *See* Exhibit BF–7.

17) It is a standard of trade in the toy industry that a licensor of intellectual property rights be presented for approval a prototype of the product that bears its marks, logos or graphics. *See* HT I 40:17–41:10 (P. Ash-

er); Hearing Trans., Vol. II ("HT II") 45:24–46:2 (B. Stein, president of Trinity); HT I 196:3–6 (A. Dorfman, president of BFI); *see also* HT I 194:18–20; 205:25–206:4 (A.Dorfman).

18) Wormtrap reasonably anticipated that the keychain product Trinity proposed on behalf of BFI would not be similar to or competitive with X–Concepts' Tech Deck™ miniature skateboard line. *See* Exhibit BF7 (Alien/Trinity Agreement); HT I 123:16–125:25 (C. Carter); and Astephen Depo., 123:6–24; 135:21–136:4.

19) No one ever sent a final package or product to Wormtrap to review. *See* HT I 126:13–24 (C. Carter); HT I 204:11–14; 205:2–6; 218:22–219:7 (A.Dorfman); HT II 50:4–20; 56:22–57:4 (B.Stein); and Astephen Depo., 131:3–9.

20) Wormtrap never gave written approval to any package, product, or presentation of its logos and designs on the package or product. *See* HT I 9:3–5 (Admission of BFI by G. Rosen); HT I 126:13–127:4 (C. Carter); HT I 218:22–219:7 (A.Dorfman); HT II 52:5–10 (B.Stein); and Astephen Depo., 128:1–4.

21) Neither Trinity, nor BFI, sought or received Wormtrap's permission to use the Alien Workshop® trademark or the Alien Workshop® copyrighted designs on any product, including without limitation the "Official Danny Way Skateboard Keychain." *See* HT I 118:5–16; 126:21–25; 127:1–4 (C. Carter).

22) BFI manufactured, distributed and sold the "Official Danny Way Skateboard Keychain" containing the Alien Workshop® trademark and Alien Workshop® copyrighted de-

signs. *See* HT I 116:22–25; 117:1–6 (C. Carter).

23) The "Official Danny Way Skateboard Keychain" is a toy miniature skateboard with working trucks and wheels and a removable plastic key chain clip. *See* Exhibit X–5.

24) BFI depicts the "Official Danny Way Skateboard Keychain" on the product packaging and in its promotional materials (including its worldwide web site) without the key chain attachment in order to demonstrate the toy's "play value." *See* Exhibits X–5 and X–6.

25) If Wormtrap had been given a prototype of the "Official Danny Way Skateboard Keychain," or an accurate depiction of the product or the package before "final manufacture or distribution," Wormtrap would not have approved either the product or the package, because of the product's obvious resemblance to X–Concepts' Tech Deck®. *See* HT I 126:13–20 (C. Carter).

26) Because BFI produced a miniature toy skateboard that was not itself a skateboard keychain, it violated the terms of the license from Alien. *See* Exhibit BF7 (Alien/Trinity Agreement), paragraph 1(c); HT I 125:5–25; 126:13–20; and 128:11–17 (C. Carter). *See* HT II 59:10–18 (B.Stein).

27) BFI has manufactured, distributed and sold two generations of the "Official Danny Way Skateboard Keychain." The first generation contains both the Alien Workshop® trademark and the Alien Workshop® copyrighted designs. The second generation contains the Alien Workshop® trademark, but not the

copyrighted designs. *See* Exhibit X–6.

28) BFI only stopped distributing the miniature skateboards with Alien Workshop graphics on the boards after the Court stated in a hearing in November 2000 that it would enter an order requiring BFI to stop such distribution. *See* HT I 214:3–216:11 (A.Dorfman).

29) After the Court ordered BFI to stop distributing miniature skateboards with Alien graphics, BFI began selling and distributing a second line of Danny Way miniature skateboards. This second generation of boards continued to list Alien as skateboard sponsor on the package, reproduced Alien's trademarked and copyrighted Triad logo on the package, and stated that Alien's name and logo were used under license from Alien. *See* HT I 214:3–216:11 (A.Dorfman); HT II 56:6–18; 66:19–69:11 (B.Stein); and Exhibit X6 (BFI second generation board).

30) Even after being notified of the legal claim against them and the initiation of this lawsuit, Trinity and BFI failed to present a version of the second generation board and packaging to Wormtrap for approval. Wormtrap did not approve of the use of its name, logo or graphics for use on BFI's second generation Danny Way miniature skateboards. *See* HT II 56:6–8, 56:16–18, 56:22–57:4; and 58:7–59:1 (B.Stein).

31) BFI purposely manufactured, distributed and sold the "Official Danny Skateboard Keychain" knowing that it lacked Wormtrap's permission to use the Alien Workshop ® trademark and copyrighted designs contained therein. *See* HT I 136:20–25 (C. Carter).

32) Alternatively, BFI purposely manufactured, distributed and sold the "Official Danny Skateboard Keychain" with conscious and reckless disregard as to whether or not it possessed a license or permission from Wormtrap to use the Alien Workshop ® trademark or the copyrighted designs, or both. *See* HT I 128:11–21 (C. Carter).

33) The undertaking of $20,000 already in place is adequate to protect BFI and Trinity if X–Concepts and Wormtrap do not succeed at trial.

### *LEGAL CONCLUSIONS*

1) A party is entitled to a preliminary injunction if it shows that it is (1) reasonably likely to succeed on the merits of their lawsuit, and (2) likely to be irreparably harmed. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d. Cir. 2000).

2) Trinity's failure to respond to the motion or appear at the preliminary injunction hearing constitutes acquiescence to the terms of the proposed preliminary injunction. *See* U.S. District Court, E.D. Pa., Local Rule 7.1. Trinity was on notice of this motion for months, first as a defendant in California and then as a counterdefendant to these proceedings. Stein, the sole shareholder and officer of Trinity, was deposed in anticipation of the hearing. At a conference attended by counsel for Trinity, the hearing was postponed for a month. Yet, Trinity failed to file any opposition, did not appear at the hearing, and informed counsel for X–Concepts that they were defaulting on the motion. Stein even appeared at the hearing as a fact witness for BFI, but did not bring counsel for Trinity to oppose the motion. Under Local Rule 7.1, Trinity's inaction constitutes an agreement with the terms of Defendants' motions for preliminary injunction. .

3) Wormtrap is the registered owner of valid trademarks and copyrights in the name "Alien Workshop", the Triad logo and the skateboard graphics that are at issue in these proceedings. X–Concepts is its exclusive licensee and transferee of these rights relating to the manufacture of miniature skateboards. The ownership and validity of the intellectual property is agreed to by all parties in these proceedings. Additionally, the fact that X–Concepts is the exclusive licensee of such rights pertaining to miniature skateboards is agreed upon by both Alien and X–Concepts. *See also* Exhibits A1–A4 (Copyright registrations); Exhibit A19 (Trademark registrations); Exhibit X3 (Alien/X–Concepts Agreement); HT I 107:13–18, 108:4–111:2, 113:14–115:24, 150:10–151:4 (C. Carter); and HT I 36:12–37:13 (P. Asher).

■ 4) Irrespective of breaches by Trinity and BFI of the Alien/Trinity Agreement, Wormtrap could not have granted rights for the manufacture of miniature skateboards bearing its name, logo and graphics because these rights were transferred to X–Concepts. Copyright or trademark licenses may transfer certain rights to the exclusive licensee. *See MacLean Assoc., Inc. v. Wm. M. MercerMeidinger–Hansen, Inc.,* 952 F.2d 769, 778 (3rd Cir.1991); 17 U.S.C. § 204 (copyright license transfers certain rights). Here, Wormtrap transferred exclusive rights to use its intellectual property to X–Concepts for use on miniature skateboards. Wormtrap does not retain the right to use its intellectual property on miniature skateboards. *See* Exhibit X3. Thus, X–Concepts, not Alien, owned the rights to use the Alien name, logo and graphics on miniature skateboards and related trade dress, such rights could not have been granted to Trinity or BFI at a later date.

■ 5) The term in the Alien/Trinity Agreement, requiring Alien's written approval of the prototype and packaging, and the presentation of Alien's name, logo and graphics thereon prior to manufacture or distribution, was a material term of the contract; Trinity and BFI's failure to seek or obtain such written approval constituted a material breach of the contract. Failure to obtain written authorization when required in a license is, as a matter of law, a material breach and voids the license. *See Major League Baseball Promotion Corp. v. Colour–Tex, Inc.,* 729 F.Supp. 1035, 1042 (D.N.J.1990). It was the most important term to Alien. HT I 123:14–125:25 (C. Carter). Trinity drafted the agreement and was therefore had notice of the paramount importance of Wormtrap's authorization of the proposed keychain *before* its production and distribution.

■ 6) The manufacture by BFI of a miniature skateboard, instead of or in addition to a skateboard keychain, was a material breach of the Alien/Trinity Agreement. Trinity's agent who negotiated the contract (Astephen) assured Alien that the term "skateboard keychain" meant that it was a keychain and not a miniature skateboard like X–Concepts' Tech Deck ™ line. Carter communicated the materiality of this term to Astephen. Dorfman admitted that the BFI product, when the keychain is not attached to the board, is not a keychain. As a matter of law, the Court finds that the failure of BFI to produce a skateboard keychain (instead producing a miniature skateboard with a separate, attachable and detachable "X" keychain) was a material breach of the agreement.

7) Alien validly terminated the Alien/Trinity Agreement in April 2000 based on the breaches of Trinity and BFI of the agreement. *See* Exhibit BF31 (letter terminating agreement); HT I 28:22–129:6 (C. Carter).

■ 8) BFI and Trinity are liable for their failure to obtain Wormtrap's pre-approval of their products. When the term of a copyright license requires written approval before use, the licensee's failure to obtain written approval means the licensee has exceeded the license and is guilty of trademark or copyright infringement and unfair competition. *See Mac-Lean Assocs. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3rd Cir.1991) (licensor can sue for copyright infringement for use exceeding scope of non-exclusive license); *see also Bieg v. Hovnanian Enterp., Inc.*, 1999 WL 1018578, *6, 1999 U.S. Dist. LEXIS 17387, * 18 (E.D.Pa. Nov. 10, 1999) (movant may recover damages for "copyright infringement based on any use which exceeds the scope for the license").

■ 9) Wormtrap and X-Concepts are likely to prevail on the trademark infringement claim. To show probability of success on the merits of a trademark infringement claim, the movant must establish that: 1) the trademarks are valid and legally protectable; 2) the marks are owned by the movant; and 3) the respondent's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3rd Cir.1990). BFI has not challenged the validity or ownership of Wormtrap's trademarks. To determine confusion in a case where two companies compete, the Third Circuit looks at the use of the marks to see if they are confusingly similar. If they are, the trademark holder has shown confusion. *See Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 472-73. In this case, both X-Concepts and BFI compete to sell miniature skateboards to the public, and identical Alien Workshop trademarked names and logos appear on both companies' products.[1] Furthermore, BFI's attempt to use "nominative fair use" as a defense to the trademark infringement claim on the second generation of boards is misguided. The Third Circuit does not recognize "nominative" fair use defense, which is utilized as a defense solely in the Ninth Circuit.[2] The use of Wormtrap's name and logo on BFI's packaging as a sponsor implies sponsorship of the miniature skateboards themselves, which is confusing to the public, many of whom are young children with a concomitant lower level of consumer sophistication.

■ 10) Wormtrap and X-Concepts are likely to prevail on the copyright infringement claim. The probability of

---

1. Even if this Court were considering non-competing goods, analysis of the confusion issue under the Third Circuit's ten factor *Scott* test would yield the same legal conclusions.

2. Even if BFI could rely upon a nominative fair use defense, it fails to meet the requirements:
   (1) "the product or service in question is one not readily identifiable without use of the trademark;"
   (2) "only so much of the mark or mark is used as is reasonably necessary to identify the product or service;" and
   (3) "the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder ."
   *Liquid Glass Enterprises, Inc. v. Dr. Ing, h.c.F. Porsche AG and Porsche Cars of North Am.*, 8 F.Supp.2d 398, 402 (D.N.J.1998); *see also New Kids*, 971 F.2d at 308 (applying the same test to nominative fair use). In *Liquid Glass*, there was no fair use because it was unnecessary to use Porsche's trademarks to advertise benefits of the Liquid Glass product. *Liquid Glass* also cited the seminal case of *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir.1969), in which it was held fair use to use the name "Volkswagen" to describe a Volkswagen repair shop, but not to use the VW logo. *See Liquid Glass*, at 402-403.

success on the merits in a copyright infringement action is shown by proving ownership of the copyright and copying by the defendant. *Accord Educational Testing Services v. Katzman*, 793 F.2d 533, 538 (3d Cir.1986). Copyright registration is *prima facie* evidence of the ownership and validity of a copyright. *Id.;* 17 U.S.C. § 410(c). In this case, BFI admits that Wormtrap is the owner of the Triad ©, Mask ©, 6th Extinction Graphic ©, and Debut © copyrighted designs and Wormtrap's copyright registrations for these designs were all admitted into evidence without objection from BFI. In addition, there is no dispute that these designs appeared on the first generation of the "Official Danny Way Skateboard Keychain" and appear on the back of the packaging of the second generation of BFI's product. Additionally, BFI admits that it did not obtain Wormtrap's approval to use those designs on its fingerboards; rather, it relied on Trinity to obtain that approval. Finally, it is undisputed that Trinity never received or even sought Wormtrap's consent to affix the Alien Workshop © designs to BFI's fingerboards.

■ 11) To prove irreparable injury, the movant must only make a prima facie showing of either trademark infringement, *see S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3rd Cir.1992) ("trademark infringement amounts to irreparable injury as a matter of law"), or copyright infringement, *see Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1553 (3rd Cir.1992), or false advertising, *see Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F.Supp. 1549 (E.D.Pa.1985). As previously discussed, it is likely that the movants will succeed at trial on the merits of their trademark, copyright, and false advertising claims.

■ 12) BFI's professed intent to "stop" infringing is not a legally adequate basis to deny the preliminary injunction.

A movant has no burden to prove likely repetition of the infringement to obtain an injunction. *See Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (7th Cir.1992). "If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [movant] substantial protection of its trademark." *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135–36 (9th Cir.1986).

### CONCLUSION

As set forth above, X–Concepts and Alien Workshop have shown a convincing case as to likelihood of success on the merits and are legally entitled to a finding of irreparable harm. Therefore, the Court grants the Motions for a Preliminary Injunction. Basic Fun and Trinity Marketing are enjoined from selling the first and second generation series · of the Official Danny Way Skateboard Keychain products until further order of the Court. An appropriate Order follows. ·