

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-31-2003

# Gucci America v. Daffys

Precedential or Non-Precedential: Precedential

Docket No. 02-4046

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Gucci America v. Daffys" (2003). *2003 Decisions*. Paper 2.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/2

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed December 31, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 02-4046

———————

GUCCI AMERICA, INC.
                    Appellant

v.

DAFFY'S, INC.; JOHN DOES 1-10

———————

On Appeal from the United States District Court
for the District of New Jersey
(Civil No. 00-cv-04463)
District Judge: Hon. Alfred M. Wolin

———————

Argued: July 14, 2003

Before: McKEE, BARRY, *Circuit Judges*, and
ROSENN, *Senior Circuit Judge*

(Opinion Filed: December 31, 2003)

———————

MILTON SPRINGUT, ESQ. (ARGUED)
Kalow & Springut
488 Madison Avenue
19th Floor
New York, NY 07102
*Attorney for Appellant*

STEPHEN R. BUCKINGHAM
 (ARGUED)
DAVID L. HARRIS
MICHELLE R. NANCE
Lowenstein Sandler
65 Livingston Avenue
Roseland, NJ 07068
*Attorneys for Appellee*

---

**OPINION OF THE COURT**

---

McKEE, *Circuit Judge*.

Gucci America, Inc. appeals the district court's decision to deny Gucci's request for an order compelling defendant Daffy's, Inc. to recall counterfeit "Jackie-O" handbags. Gucci also appeals the district court's denial of Gucci's request for an accounting of profits and other injunctive relief. For the reasons that follow, we will affirm.

## I.  FACTUAL BACKGROUND

Daffy's is a chain of retail clothing stores specializing in selling popular brands of goods and apparel at discount prices. In late May 2000, Daffy's acquired three sizes of a handbag that appeared to be a particular Gucci model known as the "Jackie-O". Daffy's purchased 594 of these handbags from its supplier, Sara's Collection, Inc., for prices ranging from $238 to $250 depending on size. Sara's Collection, Inc. was recognized as a reputable supplier, and Daffy's had previously purchased products from it.

The events leading to the purchase began when a representative of Sara's approached Daffy's regarding some Gucci handbags that were being diverted to the United States from a merchant in the Far East. Although Daffy's representatives were confident that the bags were genuine, Daffy's nevertheless attempted to authenticate the bags by taking them to a Gucci outlet store in Secaucus, New Jersey before offering them for resale. There, a Daffy's employee presented one of the bags to the Gucci clerk and informed the clerk that she had received the bag as a gift

and was not certain of its authenticity. The employee asked the clerk to examine the bag and confirm that it was genuine. The clerk did so, and informed the Daffy's employee that the bag was authentic. That conclusion was based on certain indicia of authenticity including the quality of fabric and leather, the storage bag the handbag came in, and the Gucci label and appropriate codes on the bag. The clerk also compared the bag with another Gucci bag in the store.

Daffy's also sent one of the bags it had purchased that was damaged to the Gucci repair center in New York for repair. Gucci repaired the bag and returned it without comment or further inquiry. Based upon its experience with its reputable supplier, the corroboration of the Gucci clerk, and the unquestioned repair and return of one of the bags from Gucci's own service center, Daffy's concluded that the bags it had purchased from Sara's were genuine Gucci bags. That conclusion was incorrect. The bags were actually counterfeit, although they were of exceptional quality, expensive, and virtually indistinguishable from genuine Gucci bags.

Daffy's proceeded to sell a total of 588 of these bags for $298.99, $339.99 and $398.99 depending on size. The sales continued through the summer of 2000. Daffy's remained unaware of any problem until counsel for Gucci sent Daffy's a letter dated September 5, 2000, demanding that Daffy's immediately cease selling the bags and that Daffy's disclose its supplier to Gucci. Daffy's responded by informing Gucci that the bags had been obtained from a legitimate parallel importer outside of Gucci's authorized chain of distribution and it believed the bags were genuine Gucci bags. Nevertheless, despite its belief that the bags were genuine and that it had done nothing improper, Daffy's immediately withdrew the handbags from its stores and has since adopted a policy of not buying any Gucci merchandise in order to avoid the possibility of purchasing counterfeit Gucci goods.

## II.  PROCEDURAL HISTORY

Despite the steps Daffy's took after being informed of the

counterfeit nature of the Gucci bags it was selling, Gucci sued seeking an Order to Show Cause why Daffy's should not be preliminarily enjoined from infringing Gucci's trademark through the sale of counterfeit "Jackie-O" handbags.[1] The requested relief was denied, and the court also denied Gucci's motion for expedited discovery directed at Daffy's supplier. In the court's view, Gucci had not demonstrated a sufficient likelihood of success on the merits to justify the equitable relief it requested. In an effort to avoid unfair prejudice to any party, the district court severed the factual issue of the authenticity of the Daffy's handbag and proceeded to a bench trial on the merits of that issue. *See Gucci America, Inc. v. Daffy's, Inc.,* No. 00-4463, 2000 WL 1720738 (D. N.J. Nov. 14, 2000) (denying preliminary injunction and severing authenticity issue for trial).

Gucci's head of quality control testified extensively at the ensuing trial. Based upon that testimony, the court concluded that the bags Daffy's sold as genuine Gucci product were, in fact, counterfeit bags not manufactured by Gucci. However, as the district court made clear in its fourth written opinion in this case, "the Daffy's handbag was an extremely high-quality product, capable of fooling even a very discriminating examiner. It should be apparent . . . that the quality of the counterfeit and the difficulty in distinguishing it from a true Gucci has colored every step of this litigation." *Gucci America v. Daffy's Inc.*, No. 00-4463 slip. op. at 2 (D. N.J. Nov. 16, 2001) ("*Gucci IV*").

The district court then moved to the remedy phase of the trial. Gucci first requested an order compelling Daffy's to contact those consumers who had purchased the counterfeit bags and offer them a refund. As detailed below, this requested recall was denied, and Daffy's and Gucci then filed cross-motions for partial summary judgment. We are concerned here with Gucci's cross-motion for partial summary judgment. Gucci sought an injunction preventing Daffy's from using the Gucci trademark, a finding that

---

1. Gucci alleged violations of §§ 32(1) [15 U.S.C. § 1114(1)] and 43(a), [15 U.S.C. § 1125(a)] of the Lanham Act, and sought remedies for the alleged violations under § 35 of the Lanham Act codified at 15 U.S.C. § 1117.

Daffy's willfully infringed that trademark through the sale of the counterfeit Gucci bags, and an award of profits based upon that allegedly willful infringement. Daffy's insisted that Gucci was not entitled to profits because there had been no willful infringement, and Daffy's also argued that Gucci was not entitled to an injunction because it could not establish the necessary harm.

The district court explained its denial of the requested recall in its November 14, 2001 Memorandum Opinion. *Gucci IV* at 2. The court stated that it had considered whether:

> (1) the defendant acted in a willful or otherwise egregious manner
>
> (2) the risk of confusion to the public and injury to the trademark is greater than the cost and burden of recall to the alleged infringer and
>
> (3) there is substantial risk of danger to the public resulting from the defendant's infringing activity.

*Id.* at 4. After concluding that Daffy's had not acted willfully, and recognizing that Gucci failed to establish a genuine issue of fact as to whether Daffy's acted intentionally or with willful blindness in selling counterfeit handbags, the court undertook the balancing encompassed by the second prong of its inquiry. *Id* at 5-8. In doing so, the court first considered the low risk of public confusion due to the high quality and price of the bags and low risk of injury to the Gucci trademark. *Id.* at 8-9 The court then weighed the benefits Gucci might derive from a recall against the negative impact a recall could have on Daffy's goodwill, as well as the difficulties of obtaining the necessary consumer information for a recall. *Id.* at 10-11. The court concluded that the balance tipped in favor of Daffy's and therefore denied Gucci's motion for a recall. *Id.* at 12.

The district court agreed that Daffy's had infringed Gucci's trademark, *Gucci America v. Daffy's Inc.,* No. 00-4463 slip. op. at 3-4 (D. N.J. Sept. 3, 2002) ("*Gucci V*"), but denied Gucci's request for an award of Daffy's profits based on the absence of the willfulness required under

*SecuraComm Consulting Inc. v. Securacomm Inc.,* 166 F.3d 182 (3d Cir. 1999). *Id.* at 10-12. The court also rejected Gucci's request for a permanent injunction because Gucci could not demonstrate irreparable injury. *Id.* at 13. In doing so, the court noted Daffy's attempts to minimize damage to Gucci by voluntarily withdrawing the offending merchandise from Daffy's shelves,[2] and the court concluded that Daffy's was therefore highly unlikely to infringe Gucci's trademark again. *Id.* at 14. Thus, in the court's view, balancing hardships weighed in favor of Daffy's and against granting Gucci's requested relief. *Id.* at 15. This appeal followed.

### III. DISCUSSION

Congress has explained that:

> The intent of [the Lanham] Act is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127 (2003). The Senate Report on the Lanham Act reinforces the congressional intent behind the legislation noting that Congress enacted it to:

> protect the public so that it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time and money in

---

2. Gucci notes that only six bags remained on Daffy's shelves at that point.

presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

*Weil Ceramics v. Dash*, 878 F.2d 659, 672 n.17 (3d Cir. 1989) (quoting S.Rep. No. 1333, 19th Cong.2d Sess., *reprinted in* 1946 U.S. Code. Cong. Serv. 1274).

As noted above, Gucci brought this suit for trademark infringement under Sections 32(1) and 43(a) of the Lanham Act. Section 32(1) provides in pertinent part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, . . . of a registered mark in connection with the sale, . . . or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, *the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.*

15 U.S.C. § 1114 (2003) (emphasis added). Section 43(a) further provides as follows:

(1) Any person who, on or in connection with any goods or services, . . uses in commerce any . . . symbol, . . . or any false designation of origin, . . which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the . . . origin, . . .

\* \* \*

(B) shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2003). Section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), is critical to our analysis. That

section authorizes courts to issue injunctions for trademark violations "according to the principles of equity and upon such terms as the court may deem reasonable. . .". Recovery of lost profits is governed by § 35(a) of the Lanham Act which provides in relevant part:

> (a) When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) [15 U.S.C. § 1125(a) or (d)], or a willful violation under section 43(c) [15 U.S.C. § 1125(c)], shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 U.S.C. §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a) (2003).

With these statutory parameters in mind, we turn to the precise issues raised in this appeal.

## A.   Recall Order

We review the district court's denial of Gucci's request for recall of the counterfeit handbags for an abuse of discretion. *See Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 472 (3d Cir. 1990); *see also Perfect Fit Industries v. Acme Quilting*, 646 F.2d 800, 807 (2d Cir. 1981). "[A] district court has abused its discretion if it has rested its decision on 'a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" *Jacquin*, 921 F.2d at 472 (quoting *International Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir.1987)).

Both Daffy's and Gucci agree that the propriety of the court's recall decision is governed by:

> 1.   the willful or intentional infringement by the defendant;

> 2.   whether the risk of confusion to the public and injury to the trademark owner is greater than the burden of the recall to the defendant; and

3. substantial risk of danger to the public due to the defendant's infringing activity.

*See* Theodore C. Max *Total Recall: A Primer on a Drastic Form of Equitable Relief*, 84 Trademark Rep. 325, 327 (1994) (listing these factors); *see also Perfect Fit Industries v. Acme Quilting Co*, 646 F.2d 800, 807 (2d Cir 1981) (weighing the first two factors in decision to order recall).

Gucci first argues that the district court failed to give "heavy weight" to whether the public would benefit from a recall. Appellant's Brief at 29. Gucci also argues that the court underestimated the harm the company may suffer due to the infringement and that it erred in evaluating the hardship Daffy's would face in effectuating a recall.[3] Daffy's, on the other hand, argues that the district court accurately considered all the equities in its proper exercise of discretion.

Gucci does not argue that Daffy's conduct created a substantial risk of danger to the public, nor does Gucci contest the district court's conclusion that Daffy's was "an innocent infringer," *Gucci V* at 10, or that Daffy's was unaware of the counterfeit nature of the bags it was selling. Therefore, we may focus our discussion on the court's resolution of the balancing of harms required under the second factor set forth above.

Gucci's contention that the district court failed to afford the public interest "heavy weight" is simply without merit. The argument rests entirely on the fact that Daffy's customers did not get genuine Gucci handbags. The district court did consider the benefit the consuming public would receive from recalling the counterfeit bags. The court

---

3. Gucci suggests that the counterfeit bags resulted in Gucci losing its quality control and that this is an additional harm that the court ignored. However, Gucci's arguments regarding loss of quality control were raised for the first time on appeal, and therefore we will not consider them. *See Srein v. Frankford Trust Co.*, 323 F.3d 214, 224 n.8 (3d Cir. 2003)(declining to consider argument raised for first time on appeal and noting that the court will not consider such arguments absent compelling circumstances). In any event, the record lacks any evidence that Daffy's handbags were of significantly inferior quality or even readily distinguishable from Gucci's.

explained that it had "given serious consideration to the fact that denying a recall will leave Daffy's customers under the continued misapprehension that they own a real Gucci product." *Gucci IV* at 11-12. The court simply concluded that the benefit did not justify the concomitant harm a recall would have upon Daffy's, an innocent infringer. We therefore find Gucci's attack upon the district court's analysis unconvincing.

Gucci does not explain the difference between the "heavy weight" it argues the district court should have afforded the public benefit of a recall, and the "serious consideration" the district court gave it. Moreover, we agree with the district court's determination that the public benefit of a recall does not outweigh the equities counseling against it. A recall would have a financial impact upon Daffy's. It would also likely injure the company's goodwill as consumers may well assume that Daffy's was guilty of intentional wrongdoing no matter how carefully Daffy's explained the circumstances leading to any recall. Since the counterfeit bags were virtually indistinguishable from Gucci manufactured bags, the district court quite reasonably concluded that "a recall would harm Daffy's with little real benefit to Gucci," *Gucci IV* at 12, or the public.

Gucci invokes a post-sale confusion theory, which presumes that "the senior user's potential purchasers or ongoing customers might mistakenly associate the inferior quality work of the junior user with the senior user and, therefore, refuse to deal with the senior user in the future." *Axicom Corp. v. Axiom*, 27 F.Supp. 2d 478, 497 (D. Del. 1998); *see also Payless Shoesource v. Reebok International*, 998 F.2d 985, 989 (Fed. Cir. 1993) (describing post sale confusion as that which occurs when "a consumer observes someone wearing a pair of Payless accused shoes and believes that the shoes are Reebok's. As a consequence, the consumer may attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image."). Yet, Gucci does not challenge the district court's conclusion that, given the quality of the counterfeit bags, third party observers would not perceive anything inferior about them. Accordingly, consumers would not attribute substandard merchandise to Gucci.

Gucci does, however, claim that the district court gave short shrift to its concerns over ongoing confusion of Daffy's consumers who unknowingly possess a counterfeit "Gucci."

Although this position has some initial surface appeal, it does not withstand scrutiny. As we noted above, the district court considered the dangers of customer confusion. It gave "serious consideration to the fact that denying a recall will leave Daffy's customers under the continued misapprehension that they own a real Gucci product." *Gucci IV* at 11-12. However, the court was convinced that this did not justify a recall because the quality of the counterfeit bags and the relatively high price Daffy's customers were willing to pay for them undermined claims of a tarnished Gucci trademark.[4] Finally, in the absence of sufficient evidence regarding the comparative durability of Daffy's bags and Gucci's bags, Gucci's conclusion that counterfeit bags would require greater maintenance rests upon pure speculation. Accordingly, the district court stated the following in explaining why the equities precluded ordering a recall:

> The potential for damage to Daffy's goodwill with its customers is too obvious to be belabored. Daffy's marketing niche, distress sales of designer goods at significant discounts, would mean nothing if the consumer lacked confidence that the goods were what they purport to be. Daffy's also points out that a recall would require credit card records available only from the issuing banks.

*Gucci IV* at 10. Following a brief discussion of the exceptions to federal privacy laws which would allow for the release of customer information from banks, the court continued:

> Notwithstanding, the affront to the privacy of Daffy's customers, extending the customer's ill-feeling engendered by the counterfeiting to the wholly

---

4. The district court quite reasonably concluded that the relatively high price would suggest quality consistent with the image Gucci is apparently trying to protect.

unrelated credit card issuers, is unmistakable. This adds an additional counterweight in the balance of the hardships against ordering a recall.

Finally, there is the real possibility that consumers notified of this action will decline to come forward.[5] Gucci does not contend that the Court should compel Daffy's customers to surrender their handbags. An underpinning of Gucci's post-sale confusion argument is that Daffy's customers are posing as true Gucci wearers, free-riding on Gucci exclusivity at a Daffy's price. But this theory would hold regardless of whether the consumer herself knew that the handbag was a counterfeit. Thus, under Gucci's own construct of the consumer mind-set, a Daffy's customer informed of the counterfeiting might well decide that she is content with her bargain and decline to return the handbag. Lastly, with the passage of time there is a real possibility that the Daffy's handbags have been discarded, were given away as gifts, or are otherwise unavailable.

*Gucci IV* at 11. The court's factual conclusions are not clearly erroneous. Given the careful application of the correct equitable standard to the evidence before it, it is clear to us that the district court did not abuse its discretion in refusing to order a recall.[6]

### B. Summary Judgment-Injunctive Relief and Award of Profits

We review the district court's decision to grant or deny an injunction for an abuse of discretion. *Ameristeel Corp. v.*

---

5. Moreover, Daffy's has represented in its brief and without contradiction at oral argument that only approximately 200 of the total 588 bags that were sold were purchased with credit cards. The remaining 388 were apparently purchased with cash and therefore Daffy's can not trace them to the purchasers.

6. Gucci also briefly attempts to justify its request for a recall by analogy to appropriate remedies for consumer fraud under federal and state law. Appellant's Brief at 41-3. However, the analogy fails because Daffy's conduct is not analogous to the intent necessary to establish consumer fraud.

*Int'l Brotherhood of Teamsters*, 267 F.3d 264, 267 (3d Cir. 2001). That same standard applies to the court's refusal to award Gucci lost profits. *See SecuraComm,* 166 F.3d at 189 (reviewing award of profits for abuse of discretion).

## 1. Injunctive Relief

At the outset of our discussion of Gucci's challenge to the district court's refusal to order an injunction, we note that Gucci's concerns were substantially satisfied by Daffy's voluntarily enacted policy of not dealing in Gucci products. Daffy's counsel confirmed this policy at oral argument, though some confusion about the precise parameters of that policy remains.[7] Gucci nevertheless contends that the district court erred by considering an injunction that was broader than Gucci was seeking. More specifically, Gucci argues that it requested injunctive relief prohibiting Daffy's from future infringement, while the court considered an injunction "to prohibit Daffy's from ever using the Gucci's trademark in the future." *Gucci V* at 13. Gucci further argues that the court incorrectly required Gucci to prove that it would be irreparably injured by the denial of injunctive relief rather than placing the burden of proving absence of harm on Daffy's. Finally, Gucci argues that the district court erred by focusing only on the danger of future intentional infringement and ignoring what it labels "evidence of substantial danger of future unintentional infringement."

An examination of the district court's opinion reveals that the court correctly considered an injunction to prevent future infringement. Although the court mentioned that the

7. Gucci and Daffy's apparently disagree about whether Daffy's intends the policy to be indefinite. However, that does not alter our analysis or our resolution of the issues Gucci is raising. Moreover, inasmuch as Daffy's has relied upon this policy in arguing against injunctive relief both here and before the district court, our affirmance of the district court's denial of an injunction will be without prejudice to Gucci's right to seek injunctive relief if in the future Daffy's abandons or alters this policy such that injunctive relief becomes appropriate. However, we take no position now as to Gucci's entitlement to any injunctive relief in the future.

injunction requested was to prevent Daffy's from ever using Gucci's trademark again, it also made clear that Daffy's efforts to minimize the damage to Gucci before the bags proved to be counterfeit "undermines any inference that Daffy's intends to infringe Gucci's trademarks in the future." *Gucci V* at 14. We understand that Gucci maintains that Daffy's presale inquiry was not adequate. Indeed, the dissent suggests that Daffy's effort "was simply a superficial effort to cover itself in the event of a lawsuit." Dissent at 28. However, the sufficiency of the inquiry does not suggest that the district court erred in considering Daffy's presale inquiries in assessing the likelihood of future infringement or the need for an injunction.[8] Moreover, the court's statement shows that it knew the injunction was being requested to stop trademark infringement, as Gucci requested.

The dissent argues that Gucci established irreparable harm and that the district court should therefore have granted an injunction against future infringement. Dissent at 35. According to the dissent, infringement constitutes irreparable injury as a matter of law and therefore Daffy's had the burden "to prove that the injury will not recur in the future." *Id.*

> In deciding whether to grant a permanent injunction, the district court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest.

*Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001). Although we have said that " 'trademark infringement amounts to irreparable injury as a matter of law," dissent at 27 (quoting *S & R Corp.*, 968 F.2d at 378), the

---

8. We have previously stated that "carelessness is not the same as deliberate indifference with respect to another's rights in a mark or a calculated attempt to benefit from another's goodwill." *SecuraComm*, 166 F.3d at 188 (the defendant's failure to conduct a trademark search does not suggest wilful infringement of plaintiff's mark.).

irreparable injury we referred to was not intended to swallow the remaining prongs of the permanent injunction inquiry.

In *S & R Corp.*, we stated:

> Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Lack of control amounts to irreparable injury regardless of allegations that the infringer is putting the mark to better use. Irreparable injury can also be based on the possibility of confusion. Finally, and most importantly for this case, trademark infringement amounts to irreparable injury as a matter of law.

968 F.2d at 378 (citations omitted). We cited *Opticians Assoc. of America v. Indept. Opticians of America* in support of our pronouncement that trademark infringement constitutes irreparable injury as a matter of law. A closer look at *Opticians* will therefore further inform our analysis of the district court's denial of injunctive relief here.

In *Opticians*, we concluded that infringement constitutes a *per se* injury "[e]ven if the infringer's products are of high quality, . . ." 920 F.2d at 196. This is because infringement inhibits the owner's "ability to control its own Guild marks, which in turn creates the *potential* for damage to its reputation. Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Id.* However, as we noted above, Gucci argued injury from loss of control for the first time on appeal, and that aspect of irreparable injury was therefore been waived. *See supra* at n. 3. Accordingly, the district court correctly focused on the *actual* injury to Gucci's reputation and goodwill in finding that Gucci had not established irreparable harm for purposes of injunctive relief.

Gucci primarily cites two cases in support of its claim that the burden shifts to defendant to demonstrate the impossibility of future harm once the plaintiff establishes that the defendant infringed plaintiff's trademark. *See* Appellant's Brief at 44-46.[9] However, neither case advances Gucci's claim given the circumstances here.

9. Gucci also cites *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) and *Basic Fun, Inc. v. X-Concepts, LLC,* 157

*Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997) involved an egregious case of a dealer counterfeiting Levi jeans. The court concluded that the defendant's conduct demonstrated that the defendant could not be trusted and an injunction was therefore necessary to protect plaintiff's trademark.

*Lyons Partnership v. Morris Costumes Inc.,* 243 F.3d 789, 800 (4th Cir. 2001) does offer Gucci a bit more support given this record. There, the court held that the defendant was not a willful infringer. The defendant was renting three costumes resembling characters in the popular children's television show, "Barney." Apparently, the costumes bore such a strong resemblance to characters on the show that many children mistakenly associated the wearer of the costumes with the real purple dinosaur they saw on television. The court described the situation as follows:

> Lyons Partnership, L.P., . . . , a Texas limited partnership, owns all of the intellectual property rights to the character "Barney," the well-stuffed Tyrannosaurus Rex with a green chest and stomach, friendly mien, green spots on its back, and yellow "toeballs." Barney is readily recognizable to young children, who repeatedly parrot his song, "I Love You,"[10] often testing the patience of nearby adults.

243 F.3d at 795 (footnote in original).[11] The court

F.Supp. 2d 449, 457 (E.D. Pa. 2001) in support of its burden shifting argument. *Polo Fashions* involved a defendant who had willfully violated Polo's trademark rights and *Basic Fun* examined a copyright licensee's failure to comply with the terms of a copyright license. Given the facts, it seems clear that the enjoined parties in both cases previously engaged in intentional behavior which undermined their credibility and good faith.

10. Many can recite only the first three lines of the song:

I love you.
You love me.
We're a happy family.
With a great big hug and a kiss from me to you,
Won't you say you love me too?

11. Based upon the folk wisdom that counsels that some things are better left to the imagination, we will resist the temptation to "go there"

considered the defendants' claim that they would voluntarily stop renting the costumes and hand them over to "Barney," once litigation ended. *Id.* at 800-01. However, that concession did not prevent the court from granting injunctive relief. Rather, the court concluded that in an infringement case, assertions alone are not enough to eliminate the "plaintiff's 'reasonable expectation that the alleged violation will recur' in the absence of a court order." *Id.* at 801. However, we think it significant that one of the defendants continued to claim that it was not infringing plaintiff's trademark by renting the costumes even after plaintiff informed the defendant of the infringement and filed suit to stop it. That defendant also argued that the plaintiff could not establish that continuing infringement was possible. *Id.* at 800. Accordingly, the court was not convinced that plaintiff's trademark would be honored absent an injunction. However, the fact that the court in *Lyons Partnership* concluded that the circumstances there required an injunction does not mean that the district court here abused its discretion in concluding that an injunction was not necessary given Daffy's conduct.[12] We believe that

---

and explore the subtleties of "toeballs." The Court of Appeals for the Fourth Circuit did not favor us with an explanation, and none readily suggests itself to us. Perhaps, as is true with so many things that are peculiar to the universe of young children, for those who understand "toe balls," no explanation is necessary. For those who do not understand them, no explanation is possible.

12. The nature of the potential harm threatening Lyons, the owner of the Barney trademark, substantially differed from the harm threatening Gucci. Infringement of the Barney trademark could therefore have harmed Lyons in a manner not analogous to any harm Gucci could have suffered from Daffy's infringement given the quality of the counterfeit bags. The court in *Lyons* was careful to note that:

> The live appearance of the Barney character, who is played by adults in costume, is completely controlled by Lyons, and Lyons does not license Barney costumes because of its inability to police the behavior of those who might appear in the costume. It claims that it would be unable to prevent would-be Barneys from behaving in a decidedly un-Barney-like manner and tarnishing his wholesome reputation. Accordingly, every person who wears the costume—there

conclusion was reasonable, and that the district court did not abuse its discretion in denying Gucci the injunction given this record and the inquiry properly undertaken under *Shields.*

## 2. Award of Profits

Finally, Gucci argues that the district court erred by relying on *SecuraComm* in conditioning an award of profits upon a finding of willful infringement. *SecuraComm* involved a trademark infringement action brought by a Pennsylvania security systems consulting firm against its New Jersey competitor. *SecuraComm*, 166 F.3d at 184-86. At the close of trial, the district court awarded the plaintiffs 10% of the defendant's gross profits after finding that an award of profits was necessary to " 'deter[ ] . . . the kind of conduct in which all three defendants . . . engaged.' " *Id.* at 186 (quoting *SecuraComm Consulting v. Securacomm Inc.,* 984 F.Supp. 286, 303 (D. N.J. 1997)). On appeal, the

---

> are five—is trained by a single choreographer how to be Barney. Moreover, Barney's live voice is provided by only one person. . . . *See* Brooke A. Masters, *Protecting Barney's Image from Bogus Beasts,* Wash. Post, Mar. 25, 1998, at B1.

243 F.3d at 795 (some citations omitted).

Given the importance of the Barney trademark to impressionable children, the court of appeals was particularly troubled by the district court's failure to focus on evidence of confusion in the relevant market. *Id.*, at 802 ("The evidence of actual confusion among children, . . which the [district] court disregarded, was substantial."). That omission was fatal to the district court's analysis. The court of appeals explained:

> in conducting its infringement analysis with respect to works targeted at children, the district court should have considered the perspectives of those children. . . . [B]oth [the defendant] and . . . parents foresaw that the costumes would be used to entertain children.

*Id.* at 803. Given the nature of the target audience and the equivocal nature of the defendant's "concession" about future use, the court of appeals concluded that it was an abuse of discretion to deny Lyons injunctive relief to insure against the harm that would result from future infringement. That is simply not our case.

defendants contested the award of profits, which was largely based on the court's finding that the infringement was willful. *Id.* The court began by pointing to § 35(a) of the Lanham Act [15 U.S.C. § 1117(a)], which then provided:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a), shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 and *subject to the principles of equity*, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*Id.* (emphasis added). In *SecuraComm*, we noted the importance of the intent to an award of profits, stating that "[t]hough the standards for (1) awarding profits; (2) determining whether such an award should be enhanced; and (3) awarding attorneys' fees under the Lanham Act differ somewhat, the issue of willful infringement is central to each." *Id.* at 187 (citations omitted). Willful infringement was viewed as having a central role in each type of relief "because of the relevance of equitable factors in determining their appropriateness on a given set of facts." *Id.* at 187 n.1. We clearly stated that "[k]nowing or willful infringement consists of more than the accidental encroachment of another's rights. It involves an intent to infringe or a deliberate disregard of a mark holder's rights." *Id.* at 187.

After examining whether the district court's finding of willful infringement was clearly erroneous, we concluded that the award of profits was inappropriate. *Id.* at 190. *SecuraComm* acknowledged that:

> [t]he Lanham Act permits courts to award monetary damages to trademark owners as compensation where it is equitable to do so regardless of the willfulness of the defendant's infringement. Here, however, the District Court awarded profits to deter defendant's assuredly egregious misconduct; a plaintiff must prove that an infringer acted willfully before the infringer's profits are recoverable.

*Id.* (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.), *cert. denied*, 506 U.S. 991, 121 L. Ed. 2d 445, 113 S. Ct. 510 (1992); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:62, at 30-102 (4th ed. 1996)).

Gucci contends that the bright line we recognized in *SecuraComm* has been undermined by subsequent amendments to the Lanham Act and that case is therefore of limited application here. The Trademark Amendments Act of 1999, in § 35(a), substituted "a violation under section 43(a), or a willful violation under section 43(c)," for "or a violation under section 43(a)." *See* Pub. L. 106-43 § 3b (1999) (amending § 35(a)). Therefore, the relevant language of § 35(a) now reads:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a) or (d) [15 U.S.C. § 1125(a) or (d)] of this title, or a willful violation under section 43(c) [15 U.S.C. § 1125(c)] of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 U.S.C. §§ 1111 and 1114] of this title, *and subject to the principles of equity*, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. 1117(a) (2003). (emphasis added). Gucci argues that this change signaled Congress's intent to remove willfulness as a condition precedent to awarding an accounting of profits under § 35(a). The House Report on the Trademark Amendments Act of 1999 stated in its section by section analysis that the Amendments Act:

> amends section 35(a) of the Lanham Act, which provides for recovery of profits, damages and costs, and attorneys fees for violations of rights, by clarifying that recovery of profits, damages and costs, and attorneys fees are also available for a willful violation under section 43(c), which provides holders of a famous mark the right to obtain relief for dilution.

Trademark Amendments Act of 1999, H.R. Rep. 106-250 at 10 (1999). The Report therefore suggests that willfulness is a prerequisite in a trademark dilution cause of action, not an infringement action.

The Federal Trademark Dilution Act of 1995, which is codified at § 43(c) of the Lanham Act [15 U.S.C. §§1125(c), 1127] creates

> a federal cause of action to protect famous marks from unauthorized users that attempt to trade upon the goodwill and established renown of such marks and, thereby, dilute their distinctive quality. The provision is intended to protect famous marks where the subsequent, unauthorized commercial use of such marks by others dilutes the distinctiveness of the mark.

H.R. Rep. No. 104-374, at 2-3 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029-30.

The amendment to § 35(a) was discussed in *Quick Technologies Inc. v. Sage Group PLC*, 313 F.3d 338, 347-48 (5th Cir. 2003), and Gucci relies upon the decision in *Quick Technologies* in arguing that *SecuraComm* is no longer viable given the change in the statute.[13] *See* Appellant's Brief at 51. The court in *Quick Technologies* refused to find that willful intent was a condition precedent to an award of profits for trademark infringement. As Gucci notes, the court proclaimed: "in light of the plain language of § 1117(a), . . . we decline to adopt a bright-line rule in which a showing of willful infringement is a prerequisite to an accounting of profits." *Id.* at 349. In doing so, the court

---

13. It is worth noting that *Tamko Roofing Products, Inc. v. Ideal Roofing Co. Ltd.*, 282 F.3d 23 (1st Cir. 2002) affirmed a district court's decision to award profits absent a showing of fraud or bad faith. The decision was based on a precedential rule "that an accounting of defendant's profits where the products directly compete does not require fraud, bad faith, or palming off." *Tamko Roofing*, 282 F.3d at 36 (citations omitted). The court noted that several circuit courts of appeals require a finding of willfulness in order to award an infringing defendant's profits and agreed that "when the rationale for an award of defendant's profits is to deter some egregious conduct, willfulness is required." *Id.* at 36 n.11 (citing *SecuraComm Consulting*, 166 F.3d at 190).

noted the substantial authority to the contrary, including our holding in *SecuraComm. Id.* at 347. The court quoted the language of the 1999 amendment and concluded that, rather than conditioning an award of profits upon a finding of willful intent, Congress intended a broader approach that considered:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Id.* (quoting *Pebble Beach Co. v. Tour 18 Ltd.,* 155 F.3d 526, 554 (5th Cir. 1998)).

The dissent also relies in part upon *Quick Technologies,* and describes it as "the only Court of Appeals that has considered [the issue of the necessity of willfulness] since the statute's amendment." Dissent at 30. However, we do not believe that *Quick Technologies* supports an award of profits here. Rather, it supports our conclusion that the district court did not err in refusing to award profits on this record.

The District Court in *Quick Technologies* instructed the jury that it could not award lost profits for the defendant's infringement absent a finding that the infringement was willful. On appeal, the plaintiff argued that the court "erred by conditioning an award of profits upon a finding of . . . willful infringement." The defendants "urged[d the] Court to explicitly hold that willful infringement is a prerequisite to an accounting of profits under § 1117(a)." The court of appeals noted that "several of [its] sister circuits have embraced a wilfulness requirement in order to obtain an award of profits." *Id.* (citing numerous cases including our holding in *SecuraComm*). However, the court relied upon the "amendment to § 1117(a) on August 5, 1999" and refused to adopt a bright line rule. Instead, the court held that an award of profits is governed by the particular equities in each case. 313 F.3d at 348. The court then examined various equitable factors and concluded that the district court had not erred in denying an award of profits

even though it had incorrectly conditioned such an award on the willfulness of the defendant. The court explained:

> It is obvious from our cases that willful infringement is an important factor which must be considered when determining whether an accounting of profits is appropriate. . . . [H]owever, we decline to adopt a bright-line rule in which a showing of willful infringement is a prerequisite to an accounting of profits. Rather, we reaffirm the factor-based approach outlined [in our earlier cases].

*Id.*, at 349. Thus, even though the court rejected the bright-line rule we adopted in *SecuraComm*, it recognized that principles of equity still control whether profits should be awarded. *Id.* at 346 ("As this Court has previously stated, 'the goal behind §§ 1116 and 1117 remedies is to achieve equity between or among parties.' "). The individualized inquiry the court adopted to determine whether profits should be awarded was therefore aimed at achieving an equitable result. The court stressed: "[a]s [we have] previously stated, [t]he goal behind §§ 1116 and 1117 remedies is to achieve equity between or among the parties.' " *Id.* at 346-7. After noting that "a mark holder is only entitled to those profits attributable to the unlawful use of its mark," the court refused to award the plaintiff lost profits because "the principles of equity still do not weigh in favor of [such an] award." *Id.* at 350.

Accordingly, even after the 1999 amendments to the Lanham Act and any impact it may have had on our holding in *SecuraComm*, we nevertheless conclude that the district court did not abuse its discretion given the equities here, including Daffy's good faith. *See* Siegrun D. Kane, Trademark Law: A Practitioner's Guide, §16:3.1 (3d ed. 2000) (noting that "[d]efendant's profits are usually awarded only where defendant is guilty of intentional infringement, i.e. deliberately trading on plaintiff's mark"); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §30:62, 30-116 (4th ed. 2002) (stating that "[t]o obtain an accounting of profits, the courts almost always require that defendant's infringement imply some connotation of 'intent' or a knowing act denoting an intent,

to infringe or reap the harvest of another's mark and advertising.").

First, we note that, as was the case in *Quick Technologies*, the record does not establish what percentage of Daffy's sales, if any, was the result of the use of Gucci's mark. We understand, of course, that "Gucci" suggests a certain level of quality and prestige.[14] It is therefore certainly possible that the instant sales were the direct result of the exploitation of that brand name. However, it is also quite possible that the purchasers were motivated by the opportunity of purchasing what appeared to be an attractive handbag of exceedingly high quality at the very favorable price afforded by Daffy's "discount." To the extent that consumers were motivated by obtaining such a bargain, the fact that they were also obtaining "a genuine Gucci" may have been only an incidental factor in their purchase, or no factor at all. In other words, given the quality, attractiveness, and price of the bags, we cannot conclude that Daffy's could not have sold them at the same price even if they contained no reference to "Gucci." Since Gucci is "only entitled to those profits attributable to the unlawful use of its mark," the record would not support awarding Gucci lost profits. *Id.*[15]

Furthermore, the aforementioned equities that the district court enunciated in its balancing of harms also counsels against concluding that principles of equity support awarding lost profits. The price and quality of the handbags at issue, the small number of bags sold, Daffy's status as an innocent infringer, and the possibility that Gucci could recover from the actual manufacturer of the bags all weigh against awarding profits.[16]

---

14. That is the very reason that Gucci argues it was damaged by the sale of counterfeit handbags.

15. The owner has the burden of proving that lost profits are attributable to the unlawful use of the mark. *See Quick Technologies*, 313 F.3d at 350 (citing *Texas Pig Stands, Inc.,* 951 F.2d 684,696 (5th Cir. 1992)); *see also A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d Cir. 1999).

16. Given Daffy's initial inquiry and its attempts to ensure that the bags were genuine before offering them for sale, Daffy's can be viewed as a victim of the same counterfeiting Gucci is complaining of.

In recognizing that profits can be denied under principles of equity even absent the continuing viability of *SecuraComm*, Gucci suggests that equity demands such an award here to avoid unjust enrichment, because the infringer intended to trade on Gucci's good will, and also because lost profits constitute a "proxy for the trademark owner's damages." Appellant's Brief at 54. The dissent agrees, arguing, "[a]n award of the infringer's profits seeks to make the trademark owner whole for losses sustained by the plaintiff as a result of infringer's use of something that did not belong to him." Dissent at 32. However, that position would argue in favor of creating the very kind of bright-line rule that the courts, including *Quick Technologies*, have rejected. The logical extension of Gucci's position would require awarding profits in all cases of infringement. Congress clearly rejected that policy choice by making an individualized equitable inquiry central to awarding remedies under the Lanham Act.

The dissent also expresses an understandable concern that Daffy's will be unjustly enriched unless it disgorges profits. However, that concern is exaggerated where, as here, the record does not establish that the infringer was enriched *because of* the owner's mark. As noted above, that requires speculation. The district court could not conclude that Daffy's was able to sell the counterfeit bags because of the Gucci mark without speculating about whether purchasers were attracted to the handbags because of the Gucci mark as opposed to quality, price, and appearance. The district court clearly did not err in not engaging in such speculation, and it did not abuse its discretion in denying an award of lost profits.

## IV.  CONCLUSION

For all of the above reasons, we will affirm the orders of the district court denying Gucci's request for a recall. We

---

In addition, Daffy's represents without contradiction that "Gucci did not avail itself of other remedies," although the district court afforded it "every opportunity to do so." Appellant's Brief at 43. Daffy's therefore convincingly argues that Gucci waived its right to seek actual damages under § 1117 (a)(2), or to seek the counterfeit-specific remedy of statutory damages under § 1117(c)." Appellee's Brief at 43.

will also affirm the district court's order denying Gucci's request for summary judgment which precluded both injunctive relief and an award of profits.

ROSENN, *Circuit Judge*, dissenting:

The District Court erred in denying the plaintiff injunctive relief on the ground that Gucci had not sustained irreparable injury. The undisputed infringement of Gucci's undisputed trademark constituted a prima facie case of irreparable injury as a matter of law. Indeed, this court has held that "trademark infringement amounts to irreparable injury as a matter of law." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992). The District Court committed further error in denying Gucci the undisputed profits that Daffy's realized in the sale of bags under Gucci's trademark on the ground that Daffy's did not infringe willfully. The court relied on *Securacom Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182 (3d Cir. 1999), which is not a counterfeiting case and is no longer binding precedent in light of subsequent statutory amendments.

In considering the trade-mark statute as enacted in 1946, the Senate Committee on Patents reported:

> Trade-marks encourage the maintenance of quality by securing to the producer the benefit of the good reputation which excellence creates. To protect trade-marks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.

S. Rep. No. 79-1333, at 1275 (1946).

The District Court ignored the purpose of the trade-mark statute to protect the public from deceit and secure to the business community the advantages of its good name and reputation. It left the purchasers of 588 highly expensive counterfeit bags without any relief or even notice that the bags they were carrying were not genuine. The court's decision does nothing to discourage trade-mark infringement but rewards a party to the deceit by allowing it to retain all of the profits obtained by the use of the producer's good name and reputation. Moreover, the court denies the innocent trademark owner an injunction against future infringement and a recall of the spurious goods sold

under the producer's trade-mark and good name. Because the majority affirms that decision, I respectfully dissent.

I.

The majority concludes that Gucci America's (Gucci's) request for a recall of the 588 counterfeit handbags sold under the Gucci name shall be denied because the District Court's findings of the difficulties to be encountered with such a remedy were not clearly erroneous. Such a denial, therefore, adds considerable weight to Gucci's claim that Daffy's, the defendant, should be required to disgorge the profits it made in trading on the Gucci name and reputation. This is not an unreasonable request and the least that a court should do to repair the damage to the innocent owner of the trademark.

Daffy's business specializes in selling popular goods at discount prices. It operates a business which, as characterized by the District Court, involves considerable risk. As the District Court observed in denying Gucci's motion for an order compelling Daffy's to recall the counterfeit "Jackie-O" handbags, its business "is clearly not a business for the fainthearted, and Daffy's buyers are constantly aware that any given batch of branded goods offered to them might be counterfeit. If Daffy's buyers are "constantly aware" of the risk that the goods they purchase are counterfeit, how much more so must be Daffy's, the seller. This observation, without more — and there is much more to which I refer below — seriously weakens Daffy's claims of innocence and favors Gucci's claims for relief. Daffy's did not acquire the counterfeit bags directly from Gucci or through the normal chain of distribution. It purchased them without any supporting documentation from a middleman, Sara's Collections. Therefore, it knew that the nature of its business involved the risk of selling counterfeit or stolen merchandise.

Even though Daffy's knew of these possibilities, it perfunctorily "attempted to authenticate the bags" by taking one to a clerk at a Gucci outlet store in Secaucus, New Jersey. This was simply a superficial effort to cover itself in the event of a lawsuit. Daffy's did not take the bag to the

store manager or to someone in authority in the Gucci organization who was familiar with the construction of the bag. It satisfied its concern by asking some unknown retail clerk of unknown experience, of unknown authority, and with unknown familiarity with the intricacies of bag construction, to confirm the authenticity of the bag. It also sent a damaged bag to the Gucci repair center without any specific inquiry as to the authenticity of the bag.

The District Court found that Daffy's unintentionally sold counterfeit bags. However, as between a sophisticated chain of discount stores in the high risk business of selling products acquired outside the customary chain of retail distribution and without the usual authenticating documentation and an innocent infringed, the District Court rewarded the "unintentional" infringer with all the profits derived from the sale of counterfeit bags under Gucci's famed good name. The Court has favored and enriched the infringer and left the innocent and innovative creator of a famous product and trademark owner without any remedy whatsoever. Moreover, the court has denied protection against future infringement. Furthermore, it has inverted the objective of the Lanham Act. "Protection of infringers is not a purpose of the Lanham Act. On the contrary, the Act's objective is the protection of the trademark and the public." *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981).

Daffy's unjustly enriched itself at Gucci's expense and reputation. During the summer of 2000, Daffy's sold approximately 588 of the 594 Jackie-O handbags at prices ranging from $298.99 to $398.99, depending on size. These prices were far higher than the prices of the handbags Daffy's normally sells. Daffy's gained $195,000, including stipulated gross profits of $51,064.12. Daffy's generally sells $40 handbags and has sometimes sold handbags from other Italian designers for $100-$200. Daffy's acknowledged that the Gucci bags were "in a league of their own," on a different level from what they normally would sell.

The District Court held that this Court's precedent in *Securacom Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182 (3d Cir. 1999), required a showing of willful infringement in all trademark cases as a prerequisite to an award of profits.

(Dist. Ct. op. at A 21.) *Securacom* held that "a plaintiff must prove that an infringer acted willfully before the infringer's profits are recoverable." *Securacom*, 166 F.3d at 187. Willful infringement involves an intent to infringe or willful infringement of a trademark holder's rights. *Id.*

*Securacom* is no longer binding precedent because it has been superceded by subsequent statutory amendments to the Lanham Act. Willful infringement is not a prerequisite in all trademark cases for an award of profits. There is no longer an absolute willfulness requirement under Section 43(a) of the Lanham Act except for dilution claims. The Trademark Amendment Act of 1999, Pub. L. No. 106-43, 113 Stat. 219 (1999), replaced "or a violation under section 43(a)" with "a violation . . . under section 43(a), (c) or (d), or a willful violation under section 43(c). . . ." 15 U.S.C. § 1117(a). Under the new standard, I submit that the District Court erred in declining to allow Gucci to recover Daffy's profits pursuant to 15 U.S.C. § 1117(a). The specific inclusion of the word "willful" prior to "violation" in the same sentence with the word "violation" without any adjective suggests an intentional contrast between the requirements for proving each type of violation. This is the interpretation adopted by the Fifth Circuit Court of Appeals, the only Court of Appeals that has considered this issue since the statute's amendment. *See Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 348-49 (5th Cir. 2002) (declining to adopt bright-line willfulness requirement and describing pre-1999 cases as of limited utility).[1] Even in

---

1. In a recent study of remedies for trademark infringement reported in "Remedying Trademark Infringement: The Role of Bad Faith in Awarding an Accounting of Defendant's Profits," author Danielle Conway-Jones notes that the remedies for dilution are distinguishable from the remedies for infringement; only a showing of willfulness under a claim for dilution will entitle the owner of a famous trademark to all of the Lanham Act remedies, including defendant's profits. The express requirement that a mark owner show a willful violation before perfecting his entitlement to Lanham Act remedies for dilution supports the premise that the theories of recovery underlying the remedies for trademark infringement, as opposed to trademark dilution, are not dependent upon the existence of a bad faith requirement. 42 Santa Clara L. Rev. 863 (2002).

*Securacom*, this court recognized that willfulness was not an *absolute requisite* to an accounting for profits by an infringer. We stated: "The Lanham Act permits courts to award monetary damages to trademark owners as compensation where it is equitable to do so regardless of the willfulness of the defendant's infringement." 166 F.3d at 190.

An equitable remedy generally does not require willfulness, bad faith, or even wrongdoing. Instead, the question is whether the property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest. Here, Daffy's concedes that the sales of counterfeit Gucci bags netted $51,064. It cannot be seriously doubted that customers paid a premium for the Gucci name. The Seventh Circuit Court of Appeals has explained that "[a]s between the innocent infringer who seeks to get off scot-free, and the innocent infringed . . . the stronger equity is with the innocent infringed." *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 589 (7th Cir. 1989). This remedy is particularly appropriate here, where the infringer understood the risks, but made

---

Ms. Conway-Jones concludes:

> Congress did not intend bad faith to be a requirement for an award of the remedy of an accounting of profits in response to cases of trademark infringement. As demonstrated by a review of the newest substantive additions to the Lanham Act — the FTCA and the ACPA — it is apparent that Congress had several opportunities to consider and include a bad faith requirement before permitting an award of an accounting of an infringer's profits. With each opportunity, Congress remained silent on this issue. Taking the language surrounding the Lanham Act's remedy provision and reviewing the legislative history of the Trademark Act, the FTCA, and the ACPA, it is evident that the accounting of profits remedy is restricted to bad faith showings only when the cause of action pressed by the trademark owner is dilution or cybersquatting. Nowhere in the language of the statute or the legislative history is there a requirement to show bad faith in trademark infringement actions before the accounting remedy can be awarded.

*Id.* at 924-25.

only a feeble and perfunctory effort to ascertain whether the bags were authentic. On balance, the equities favor Gucci.

An accounting of profits may be seen as a rough estimate of Gucci's lost sales. Congress did not put upon the "despoiled" the often impossible burden of showing that "but for the defendant's unlawful use of the mark, particular customers would have purchased the plaintiff's goods." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942). An accounting of profits functions as a rough measure of damages, including less tangible damages such as injury to reputation. *See Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987). An award of the infringer's profits seeks to make the trademark owner whole for losses sustained by the plaintiff as a result of infringer's use of something that did not belong to him. *See Mishawaka*, 316 U.S. at 206.

The majority denies disgorgement of profits by the infringer on two untenable grounds. First, the majority views Daffy's as a victim of the counterfeiting, n.16, p. 24, given Daffy's initial inquiry to authenticate the genuineness of the bags. As pointed out above, that inquiry was feeble, superficial, perfunctory, and unsupported by any documentation. Second, the majority places an unreasonable and incredible burden upon the innocent trademark owner to prove that the infringer's customers purchased these handbags because they were attracted by the Gucci mark.

Although the majority recognizes the concern that Daffy's will be unjustly enriched unless it disgorges the profits reaped in the sale of Gucci counterfeit bags, it denies disgorgement because "the record does not establish that the infringer was enriched *because* of the owner's mark." The majority, without any supporting authority, places an untenable and virtually impossible burden upon the innocent trademark owner to prove that the purchasers of the bags "were attracted to the handbags *because of* the owner's mark," as opposed to quality, price and appearance. This burden is very much greater than the burden the District Court rejected in denying Gucci's motion for recall of the counterfeit bags. The purchasers were Daffy's customers who had no contact with Gucci.

Requiring the innocent trademark victim affirmatively to prove that the purchasers unknown to it "were attracted to the handbags because of the Gucci mark" is an argument that Daffy's never raised in the District Court or on appeal. Adopting it totally turns trademark law on its head and *ipse dixit* places an impossible and unreasonable burden on the innocent trademark victim.

## II.

Gucci is also entitled to an injunction to protect it from future unintentional infringement by Daffy's. Although the District Court found that Daffy's infringement was unintentional, there is still a danger that Daffy's will harm Gucci in the future through an incident of unintentional infringement.

To determine whether an injunction is appropriate, the District Court considered four factors: (1) whether Gucci had shown actual success on the merits; (2) whether Gucci would be irreparably injured by the denial of injunctive relief; (3) whether granting a permanent injunction would result in even greater harm to Daffy's; and (4) whether the injunction would be in the public interest. *See Gucci V* at 13 (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)). However, the District Court improperly placed the burden of proof regarding future harm on Gucci rather than on Daffy's. The District Court denied Gucci's claim for a permanent injunction because Gucci failed to produce any evidence to support a finding that it would be irreparably injured by the denial of a permanent injunction. *Gucci V* at 13-14. The District Court failed to recognize that a trademark is a form of property and neither the trademark nor the infringement here are in dispute. To prove irreparable injury, the plaintiff must only make out a prima facie case showing of trademark infringement. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992)("[T]rademark infringement amounts to irreparable injury as a matter of law."); *Basic Fun, Inc. v. X-Concepts, LLC*, 157 F. Supp.2d 449, 457 (E.D. Pa. 2001).

Although the majority acknowledges, as it must, that "trademark infringement amounts to irreparable injury as a

matter of law," it jumps to an inexplicable conclusion that Gucci's failure to argue in the District Court that the "loss of control" over its trademarked goods by the infringement also amounts to a waiver of irreparable harm "for purposes of injunctive relief." This holding incredibly transforms the "control of quality" argument asserted by Gucci in its contention that the District Court committed legal error in failing to order a recall of the counterfeit goods into a general waiver of irreparable harm "for purposes of injunctive relief." Irreparable harm was and is a basic element of plaintiff's case from its inception. Implying a *sub silentio* waiver, as the majority does, of the fundamental legal principal that "trademark infringement amounts to irreparable injury"is highly unwarranted and imprudent.

Furthermore, even though the "control of quality" argument was not presented to the District Court in Gucci's motion for recall relief, that failure should not have an adverse effect on its argument in this court, even on the recall issue. The recall issue as a form of relief is, as far as I can ascertain, a matter of first impression in this court. The argument is a legal one, requiring no additional evidence which might prejudice Daffy's. Barring its consideration under these circumstances is harsh and contrary to the prudential stance that this court took in *Ross v. Hotel Employees & Restaurant Employees Int'l Union,* 266 F.3d 236, 242-43 (3d Cir. 2001). In *Ross*, the court considered on appeal an argument not raised in the District Court. Writing for the court, Judge McKee reasoned that the appeal raised important implications for labor law and "a question of first impression in this circuit" and the District Court, as in this case, "was afforded the rare advantage of a fully developed record in analyzing the issue." *Id.* at 243. The court, accordingly, considered the argument not raised before.

By proving infringement, Gucci proved irreparable injury as a matter of law. Upon proving irreparable injury, the burden shifted to Daffy's to prove that the injury will not recur in the future. "[I]t is well established that the voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th

Cir. 2001) (internal quotation marks omitted). "That rule is subject to the caveat that an injunction is unnecessary when there is *no* reasonable expectation that the wrong will be repeated." *Id.* (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis in original)(internal quotation marks omitted). Daffy's cannot show that its putative policy against selling infringed goods moots Gucci's motion for an injunction. To show that an injunction is unnecessary and further proceedings are mooted by Daffy's plans not to sell any more Gucci products, Daffy's must meet its "heavy burden" of showing that future infringement is "practically speaking, nearly impossible." *Lyons P'ship*, 243 F.3d at 800.

Daffy's argues that it now has a policy of not buying any Gucci goods. It points out that if it does not buy any Gucci branded goods, it cannot even unintentionally infringe Gucci's trademark. That is true as long as the policy lasts, but that is of little comfort to Gucci because Daffy's has the ability to change the policy at any time. Moreover, Gucci argues that Daffy's does not point to any evidence in the record in support of its statement that it has adopted a policy never to sell Gucci goods in the future. Even now, Daffy's has no policies or procedures to authenticate merchandise. In response to our question at oral argument, Daffy's attorney would not stipulate that Daffy's will never sell Gucci's products. It merely claimed that its present policy is not to do so. No legal obligation prevents Daffy's from changing its mind tomorrow and immediately resuming sales of purported Gucci products.

Daffy's unwillingness to stipulate forbodes the possibility of future infringements, and once an infringement is shown, the trademark owner is not required to prove that the infringer is likely to infringe again. *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1151 (7th Cir. 1992); *Basic Fun, Inc. v. X-Concepts, LLC.*, 157 F. Supp.2d at 457 ("If the infringers sincerely intended not to infringe, the injunction harms them little; if they do, it gives [the trademark owner] substantial protection of its trademark."). Once infringement has been proven, a "heavy burden" falls on the infringer to demonstrate that there is no possibility of further recurrence of the infringement.

*Lyons P'ship*, 243 F.3d at 800. The unwillingness of Daffy's to stipulate that in the future it would not sell Gucci bags obviously inspires no confidence in its present policy.

Gucci did not seek an injunction as broad as the District Court actually considered — the prohibition of Daffy's from ever using the Gucci trademark in the future. Gucci sought to enjoin Daffy's only from future infringement "through sales of unauthorized goods and false advertising." It was erroneous as a matter of law for the court to place the burden on Gucci to prove that trademark infringement would continue in the future. *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001), merely identifies the four factors to be considered by the court in granting an injunction. Once an act of infringement is proven, federal courts do not require the plaintiff to show that the defendant is likely to infringe again in the future. *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997)(any doubt regarding extent of injunctive relief "must be resolved in [the plaintiff's] favor as the innocent producer and against the [defendant]"); *Basic Fun, Inc. v. X-Concepts, LLC*, 157 F. Supp.2d at 457. Once an infringement is demonstrated, a "heavy burden" shifts to the defendant to prove that there is no possibility of future recurrence of the infringement. *Lyons P'ship*, 243 F.3d at 800. Daffy's made no effort, beyond its non-binding policy, to prove that in the future it will not infringe upon Gucci's trademarks through sales of counterfeits.

For the reasons set forth above, the denial of the injunction constituted reversible error.

### III.

Accordingly, I submit that Daffy's should not be allowed to reap the profits of its infringement and the judgment of the District Court with respect to it should be reversed. I also believe that the judgment of the District Court denying the permanent injunction enjoining future infringements of Gucci's trademark, as well as attorneys' fees and costs, should be reversed.

37

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*