**STARK CARPET CORP., Plaintiff,**

v.

**STARK CARPET & FLOORING IN-STALLATIONS, CORP. and Roxana Valenzuela, Defendants.**

**No. 12–cv–119 (NG)(VMS).**

United States District Court,
E.D. New York.

June 20, 2013.

---

Bennett D. Krasner, The Law Office of Bennett D. Krasner, Atlantic Beach, NY, for Plaintiff.

## ORDER

GERSHON, District Judge.

The court has reviewed for clear error the Report and Recommendation of Magistrate Judge Vera M. Scanlon, dated and filed February 25, 2013, to which no objections have been received. Judge Scanlon has comprehensively surveyed the applicable law and applied it to the facts. The Report and Recommendation is adopted. The individual defendant Roxana Valenzuela is dismissed from the action without prejudice, and the Clerk of Court is directed to enter judgment against defendant STARK CARPET & FLOORING INSTALLATIONS, CORP., only, in the amount of $10,000 in statutory damages, without prejudgment interest, plus costs of $350.

The Clerk of Court is further directed to enter a permanent injunction, pursuant to which Defendant STARK CARPET & FLOORING INSTALLATIONS, CORP., its officers, directors, employees, agents, servants, affiliates and any person and/or entity acting under or through defendant, are hereby enjoined from directly or indirectly:

a) infringing plaintiff's trade name, trademarks and service marks containing the word "Stark" or words "Stark Carpet" in connection with defendant's business;

(b) using the word "Stark" or words "Stark Carpet" in connection with advertising, promotion, offering or performance of any services or good related in any manner to interior design products, including but not limited to carpets, rugs, broadloom carpeting, floor coverings, wall coverings, furniture, fabric and/or paint;

(c) holding itself out as the owners of or authorized users of names or marks containing the word "Stark" or words "Stark Carpet" in any manner related to interior design products, including but not limited to carpets, rugs, broadloom carpeting, floor coverings, wall coverings, furniture, fabric and/or paint;

(d) performing or engaging in any actions or use of the word "Stark" or words "Stark Carpet" which is likely to cause confusion or mistake or to deceive or otherwise mislead the trade or public into believing that plaintiff and defendant are one in the same or in some way connected or associated; that plaintiff is a sponsor of or otherwise controls defendant; that defendant is in any way affiliated with, controlled by, associated with or supervised by plaintiff; or that defendant's services or products originate with or are offered with the approval, consent, authorization or supervision of plaintiff; and

(e) using the word "Stark" or the words "Stark Carpet" in any way that would create a likelihood of injury to plaintiff's business reputation or a dilution of Plaintiff's names and marks and the goodwill associated therewith.

SO ORDERED.

### REPORT AND RECOMMENDATION

SCANLON, VERA M., United States Magistrate Judge:

### I. Introduction

On January 10, 2012, Plaintiff Stark Carpet Corp. ("Plaintiff") filed this action, alleging that Defendant Stark Carpet & Flooring Installations, Corp. ("Defendant") violated various federal and state laws by incorporating and operating a business in New York State using a trade name and trademark so similar to Plaintiff's that consumers are likely to confuse Plaintiff's and Defendant's business operations. *Docket No. 1* ("Compl."). Plaintiff alleged that Defendant's use of a trade name and trademark employing the word "Stark" violates the federal Lanham Act barring trademark infringement, 15 U.S.C. Sec. 1114, and the false designation of origin, 15 U.S.C. Sec. 1125(a); New York state statutory law prohibiting the dilution of trademark, General Business Law Secs. 360–L (injury to business reputation and dilution) and Sec. 133 (use of name or address with intent to deceive); and New York state common law prohibiting trademark infringement and unfair competition. Compl. ¶ (Nature of Action). Plaintiff also sued Defendant's putative CEO, Roxana Valenzuela, *id.*; however, in the motion for a default judgment, Plaintiff moved to dismiss Ms. Valenzuela from the action without prejudice to refile. *Docket No. 10–3.*

Despite proper service, Defendant did not answer or otherwise move in response to the Complaint. *Docket Nos. 5; 10–1, Ex. B* (service effected with Donna Christie, the New York Secretary of State). On July 17, 2012, the Clerk of the Court entered a notation of default against Defendant. *Docket No. 9.* On July 23, 2012, Plaintiff filed a motion for default judgment as to Defendant. *Docket No. 10.* On July 30, 2012, District Judge Nina Gershon granted Plaintiff's motion for default judgment in its entirety and referred the case to the Magistrate Judge for a Report and Recommendation "to determine the scope of relief, including damages, interest, costs, and attorney's fees, if any." *Docket No. 11.*

I respectfully recommend that the Court 1) grant Plaintiff's request for statutory damages to the extent the Court enter an award in the amount of $10,000 in statutory damages (but not the $25,000 requested by Plaintiff); 2) deny the request for prejudgment interest; 3) award costs of $350; and 4) grant the request for an injunction against Defendant as set forth below at pages 26–27. *infra.*

## II. Factual Summary

 The law requires a court to accept as true a plaintiff's factual proffer when uncontested by a defaulting defendant. *See Priestley v. Headminder, Inc.,* 647 F.3d 497, 504 (2d Cir.2011); *Finkel v. Romanowicz,* 577 F.3d 79, 83 n. 6 (2d Cir.2009). There is no question that a "default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability." *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 69 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). Although courts considering motions for default judgment are entitled to accept as true all well-pleaded facts in a complaint pertaining to liability, courts have an "obligation to ensure that damages [a]re appropriate." *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997) (recognizing that the factual allegations in the complaint, except those relating to damages, are deemed true after default). "Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true." *Credit Lyonnais Sec., Inc. v. Alcantara,* 183 F.3d 151, 155 (2d Cir.1999). When a district court determines the appropriate amount of damages, it must undertake two tasks: "determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule." *Id.*

A determination as to damages may be made on the paper submission where a plaintiff has not asked for a hearing but instead submitted documentary evidence of damages. *See Finkel,* 577 F.3d at 83 n. 6. Accordingly, the following facts are taken from Plaintiff's various submissions in this case to provide background, but only those allegations that relate to liability are accepted as true.

Plaintiff Stark Carpet Corp. is a New York corporation that was formed on August 23, 1946. Compl. ¶ 6.[1] Its present-day Executive Office and Main Showroom are located at 979 Third Avenue in the borough of Manhattan in New York City. *Id.* ¶ 7. Since 1946, Plaintiff has built a strong world-wide reputation as a wholesaler and, more recently, retail distributor of high-end home and commercial interior design products and services including, but not limited to, carpets, rugs and other fine floor covering, fabric, wall coverings, furniture and paint. *Id.* ¶¶ 7, 38. Plaintiff's products are delivered and installed by highly qualified and trained professionals who either work for or are approved by Plaintiff. *Id.* ¶ 15. The name Stark has become synonymous with high-end interior design products and services as a result of Plaintiff's many decades of operations; accordingly, the Stark name has significant value in terms of marketplace goodwill. *Id.* ¶¶ 6, 8. Plaintiff has registered the Stark name with the United States Patent and Trademark Office. *Id.* ¶ 9. In fact, Plaintiff has registered nine variations of

---

1. Many allegations in the complaint are repeated in the "Declaration of Facts Constituting the Claim & the Default" sworn to by Plaintiff's General Manager Edward Haleman. *Docket No. 10–2* ("Haleman Dec.").

the Stark name and mark, and all of these registrations have been current and valid through at least the filing of the motion for a default judgment. *Id.*

On December 24, 2010, Defendant filed a Certificate of Incorporation with the New York Secretary of State. *Id; Docket No. 10–1,* Ex. C. In that document, Defendant incorporated under the name Stark Carpet and Flooring Installations, Corp. *Id.* Defendant listed its address as 53–3796th Street in Corona, Queens, New York State. *Id.* In its complaint, Plaintiff stated that Defendant is knowingly using the infringing trade names Stark Carpet and Stark Carpet & Flooring Installations. Compl. ¶ 12. Plaintiff stated on information and belief that Defendant adopted the Stark mark with the intention of "trading off" Plaintiff's goodwill and confusing the public and the interior design industry. *Id.* ¶¶ 14, 21. Plaintiff also alleged that it has no control over the nature and quality of Defendant's services such that because of the confusion as to a relationship between the parties, Plaintiff's name and marks will suffer. *Id.* ¶¶ 16, 19, 26–28. Plaintiff alleged that it had suffered and would continue to suffer irreparable harm should the infringement continue. *Id.* ¶¶ 18, 22. Plaintiff stated on information and belief that Defendant is "providing carpet and installation services through similar channels of trade and to similar classes of customers of Plaintiff and Plaintiff and Defendants are in competition with respect to those services." Am Compl. ¶ 18.

Once one considers the record beyond the complaint, the factual record becomes more murky, and the extent of any continuing use by Defendant of a conflicting mark is unclear. In the Haleman Declaration, Plaintiff's General Manager explains his belief that Defendant is operating a "carpet and flooring installation business" is "based upon the fact that Defendants formed a corporation using the mark 'STARK.' " Haleman Dec. ¶ 5.

The Haleman Declaration continues: "As set forth herein above Plaintiff has been unable to ascertain whether Defendant, Stark Installations, is actually operating a business utilizing the 'STARK' mark." Haleman Dec. ¶ 13. Mr. Haleman claims that if Defendant were doing so, Plaintiff would be "irreparably and greatly injured by any use by Defendants" of the Stark mark in connection with carpet and flooring installation. *Id.* He further states that

> Plaintiff, being a well known and active participant in the carpet and flooring industry in the metropolitan area has not been able to ascertain any additional information regarding Defendant notwithstanding inquiry and investigation. Plaintiff has made inquiry within the industry regarding whether Defendant, Stark Installations, is operating its business utilizing Plaintiff's STARK name and/or any variation and/or derivation thereof. Plaintiff is not certain at this time that Defendant actually operates utilizing the mark but requests that a default judgment issue to deter any future use by Defendant of Plaintiff's 'STARK' mark.

*Id.* ¶ 14.

Plaintiff's counsel Bennett D. Krasner, Esq., tells the Court in a sworn declaration that, based on Defendant's certificate of incorporation, "[t]he association to Plaintiff's name and trademarks/service marks is patently obvious." *Docket No. 10–1* ("Krasner Dec.") ¶ 12. Mr. Krasner reports that Plaintiff, through its attorney, hired a private investigator "who rendered only a verbal report [to Plaintiff] that there were a truck, tools and equipment related to the services which it's [sic] name implies are offered by Defendant at Defendant's address." *Id.* ¶ 14. Mr. Krasner

goes on to say that he "contacted the attorney for [Defendant's] landlord who advised that [the landlord] believed that [Defendants] on the first floor were in the carpet installation business but were having trouble with the tenants and could not provide any additional information." *Id.* Mr. Krasner does not report that either the private investigator or the attorney made any mention of the use of the Stark name by Defendant.

Mr. Krasner repeated what Mr. Haleman declared about whether Defendant was operating a competing business: "Plaintiff, being a well-known and active participant in the carpet and floor covering industry in the greater metropolitan area, has not been able to ascertain any additional information regarding Defendant notwithstanding inquiry and investigation." *Id.* "Plaintiff is not certain at this time that Defendant actually operates utilizing the mark." *Id.* He requests that an injunction be issued to prevent the use of the Stark mark, and, in the event that Defendant is operating utilizing the mark, says that the award of $25,000.00 would be a sufficient deterrent and penalty to Defendant for it to change the name and cease operations using Plaintiff's mark. *Id.* He further argues that "[i]n the event it should be found that Defendant is both operating and continuing to use Plaintiff's mark," *id.*, the Court could fashion a remedy for the violation of the requested injunction. Thus, Plaintiff's own sworn statements (as compared to the allegations in the Complaint) are that its principal and attorney do not know if there is any infringing use of the marks.

In effect, Messrs. Haleman and Krasner have told the Court that Plaintiff's lawsuit is meant as a prophylactic measure. Haleman Dec. ¶ 14; Krasner Dec. ¶ 14. Plaintiff underscores the largely anticipatory

nature of its request for relief in its Memorandum of Law in Support of its Motion for Default Judgment. *Docket No. 10–3.* Plaintiff argues: "Although Plaintiff has been unable to ascertain that Defendant is currently using the mark in connection with its carpet and flooring installation business despite diligent inquiry, Plaintiff believes that any such use of the mark by Defendant would undoubtedly cause confusion among consumers and that a permanent injunction enjoining Defendant from using Plaintiff's mark is the proper remedy and necessary deterrent." *Id.* at 2; *see id.* 5–6.

### III. Discussion

#### 1. Damages

##### a. Plaintiff's request

What Plaintiff seeks in damages is a moving target. In the complaint, Plaintiff asks for treble compensatory damages; for Defendant's gains, profits and advantages; and for attorney's fees, costs and interest. *See* Compl., Prayer for Relief ¶¶ 4–9. In its notice of motion, it seeks injunctive relief and whatever other relief the Court finds just and proper to award. *Docket No. 10.* In its memorandum, Plaintiff argues for injunctive relief and statutory damages in the amount of $25,000 under 15 U.S.C. Sec. 1117(c)(1).[2] *See Docket No. 10–3* ("Pl. Mem.") at 3–4. Plaintiff writes: "Plaintiff maintains that the statutory damages demanded herein of $25,000 are reasonable and sufficient to act as a deterrent to Defendant from engaging in further infringing activity." *Id.* at 4. Plaintiff then suggests that Defendant should be subject to the willfulness provision of 15 U.S.C. Sec. 1117(c)(2), *id.*, but it does not offer any suggested amount for damages. In the affidavit of its attorney, Mr. Kras-

---

**2.** Plaintiff does not ask for damages under its New York State claims.

ner, Plaintiff requests $25,000 in statutory damages without reference to section (c)(1) or (c)(2) of the statute. *See Docket No. 10–1* (Krasner Dec.) ¶¶ 14–15. In its proposed order of judgment, Plaintiff appears to request $25,000 in damages for each of what it claims are separate statutory violations under 15 U.S.C. Secs. 1117(c)(1) & (2). *Docket No. 10–4* at 4. Given the conflicting requests made by Plaintiff, the Court will assess only the request for $25,000 in statutory damages, interest and costs because it is evident that Defendant would not have had adequate notice that Plaintiff sought any more than this in damages.[3]

### b. The Law

■■■ Pursuant to the Lanham Act, a trademark owner may elect to recover an award of statutory damages instead of actual damages for an amount between $1,000 and $200,000 "per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just;" or, if the court finds the use of the mark to have been willful, up to $2,000,000 per counterfeit mark per type of good. *See* 15 U.S.C. Sec. 1117(c); *see generally All–Star Marketing Group, LLC v. Media Brands Co., Ltd.,* 775 F.Supp.2d 613, 620–21 (S.D.N.Y.2011) ("The rationale for Sec. 1117(c) is the practical inability to determine profits or sales made by counterfeiters.") (citations omitted). This provision of the Lanham Act "does not provide guidelines for courts to use in determining an appropriate award, as it is only limited by what 'the court considers just.'" *Gucci Am., Inc. v. Duty Free Apparel Ltd.,* 315 F.Supp.2d 511, 520 (S.D.N.Y.2004) (internal citation omitted). In trademark in-

fringement cases, courts often look to the considerations set forth by decisions applying the statutory damages provision of the Copyright Act, 17 U.S.C. Sec. 504(c). *See id.* As set forth by the Second Circuit, in calculating statutory damages for copyright infringement, courts consider: (1) "the expenses saved and the profits reaped" by the defendant infringer; (2) "the revenues lost by the plaintiff; (3) "the value of the copyright"; (4) "the deterrent effect on others besides the defendant"; (5) "whether the defendant's conduct was innocent or willful"; (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced"; and (7) "the potential for discouraging the defendant." *Gucci,* 315 F.Supp.2d at 520 (quoting *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.,* 807 F.2d 1110, 1117 (2d Cir.1986)). Although statutory damages need not match actual damages, courts generally hold that "statutory damages should bear some relation to actual damages suffered." *Yurman Studio, Inc. v. Castaneda,* Nos. 07cv1241, 07cv7862, 2008 WL 4949775, at *2 (S.D.N.Y. Nov. 19, 2008) (quoting *RSO Records v. Peri,* 596 F.Supp. 849, 862 (S.D.N.Y.1984)); *see also New Line Cinema Corp. v. Russ Berrie & Co.,* 161 F.Supp.2d 293, 303 (S.D.N.Y.2001); *Sara Lee Corp. v. Bags of N.Y.,* 36 F.Supp.2d 161, 167 (S.D.N.Y.1999).

■ Statutory damages under the Lanham Act serve not only to compensate but are "also aimed at deterrence of future counterfeiting—both by the bad actor in question and by other potential counterfeiters." *Philip Morris USA Inc. v. Felizardo,* 03cv5891, 2004 WL 1375277, at *7

---

**3.** We note that Plaintiff's record does not include any information about Defendant's alleged gains, profits or advantages, or about Plaintiff's attorney's fees, so even had Plaintiff persisted in its request, the Court would not be able to award such relief without some evidence being offered by Plaintiff.

(S.D.N.Y. June 18, 2004); *see Philip Morris USA, Inc. v. Jackson*, 826 F.Supp.2d 448, 453 (E.D.N.Y.2011).

Awards of statutory damages in trademark cases run the gamut from under $100,000 to into the millions. *See Unilever Supply Chain, Inc. v. I & I Wholesale Food Inc.*, 10cv1077, 2011 WL 1113491, at *4 (E.D.N.Y. Feb. 17, 2011) (comparing cases). Courts regularly award statutory damages in the realm of up to $50,000 as amounts that both account for a defendant's willful disregard of trademark laws and as a deterrent to others who might consider engaging in infringing conduct in the future. *See All–Star Marketing Group, LLC v. Media Brands Co., Ltd.*, 775 F.Supp.2d 613, 621 (S.D.N.Y.2011); *Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc.*, 03cv2132, 2006 WL 728407, at *6 (S.D.N.Y. Mar. 21, 2006); *Coach Servs., Inc. v. K Ya Int'l, Inc.*, 09cv4656, 2010 WL 2771897, at *3 (S.D.N.Y. June 10, 2010), *report & rec. adopted*, 2010 WL 2771907 (S.D.N.Y. July 12, 2010); *Church & Dwight Co. v. Kaloti Enters. of Michigan, L.L.C.*, 697 F.Supp.2d 287, 295 (E.D.N.Y. 2009); *Cartier Int'l B.V. v. Ben–Menachem*, 06cv3917, 2008 WL 64005, at *15 (S.D.N.Y. Jan. 3, 2008).

### c. Analysis

■ Plaintiff does not address any of the factors the Court should consider in determining statutory damages or provide any explanation for the specific amount requested. The Court will look to the factors in light of the sparse factual record. Because Defendant has failed to respond to the complaint or the default motion, there is no information on which to weigh the first factor, the benefit to Defendant; the fifth factor, whether the conduct was willful or innocent; and the sixth factor, whether Defendant has cooperated with damages discovery, in any way other than in Plaintiff's favor and against Defen-

dant. *See Philip Morris USA Inc. v. A & V Minimarket Inc.*, 592 F.Supp.2d 669, 674 (S.D.N.Y.2009) ("Here, the defendants' failure to respond either to the complaint or to the papers seeking a default judgment has left the Court with no information as to any of the factors relating to the defendants' circumstances. Thus, the Court draws every reasonable inference on these points against the defendants."); *Jackson*, 826 F.Supp.2d at 453; *Philip Morris USA Inc. v. Tammy's Smoke Shop Inc.*, 726 F.Supp.2d 223, 224 (E.D.N.Y. 2010); *Hermes Int'l v. Kiernan*, 06cv3605, 2008 WL 4163208, at *4 (E.D.N.Y. Aug. 28, 2008). As to the second factor, the revenues lost by the plaintiff, Plaintiff has offered no evidence that it has lost any revenues because of Defendant's action; thus, this is a neutral factor. As to the third factor, the value of the trademark, Plaintiff has established that its trademark is a valuable well-established mark. *See* Haleman Dec. ¶¶ 6–8. As to the fourth and seventh factors, the deterrent effect on Defendant and others seems likely as Defendant and other infringers will know by this case that infringement is not without adverse financial consequences. Thus, almost all the relevant factors favor some award to Plaintiff.

The question is whether it should be the $25,000 requested or some different amount. Without detailed affidavits to support their requested amount of damages, the Court might be inclined to award the minimum amount of damages of $1,000. In *A & V Minimarket*, 592 F.Supp.2d at 674, the district court held that an award of $2,000 in statutory damages could be justified solely by the deterrent effect of the award. *See Philip Morris USA Inc. v. Cruz*, 11cv3220, 2012 WL 1744992, at *3 (E.D.N.Y. Apr. 16, 2012) (awarding statutory damages of $4000 from each defendant as requested by

plaintiff). However, to do so here would undermine the purpose of statutory damages to deter willful defendants, as is permitted by 15 U.S.C. Sec. 1117(c)(2). The Court notes that in cases of willful infringement, Congress has provided for an increase in the maximum statutory damages by a multiple of ten as against the damages for a non-willful violation, from $200,000 to $2,000,000. *Compare* 15 U.S.C. Sec. 1117(c)(1) *with* 15 U.S.C. Sec. 1117(c)(2). Applying the same multiplier to the minimum statutory damages amount to determine the appropriate statutory damages in this case is a rational and reasonable basis upon which to base a calculation in this action where there is limited information in the record to support the damages calculation. Therefore, I respectfully recommend that the District Court award $10,000 in statutory damages, which is ten times the minimum statutory damage amount. This amount recognizes Defendant's willful conduct, makes Defendant bear the consequences of failing to appear in this action, and will serve both as a specific deterrent for Defendant and a general deterrent for others contemplating the infringement of valid trademarks. *See Platypus Wear, Inc. v. Bad Boy Club. Inc.,* 08cv2662, 2009 WL 2147843, at *7 (D.N.J. July 15, 2009); *see also Coach, Inc. v. Cosmetic House,* 10cv2794, 2011 WL 1211390, at *7 (D.N.J. Mar. 29, 2011) (adopting reasoning of *Platypus Wear* to award $10,000 in statutory damages). At the same time, given the very minimal harm that Plaintiff alleges and the minimal amount of evidence of actual harm, any other award would be purely speculative, a type of award the Court declines to recommend.

### d. Prejudgment Interest

Plaintiff requests prejudgment interest from the date of the incorporation of Defendant through the date of judgment at the statutory rate. The trademark statute does not provide for prejudgment interest to victims of infringement, although it does specifically provide for such interest in cases of a wrongful seizure of goods in a trademark action. *Compare* 15 U.S.C. Sec. 1116(d)(11) *with* Sec. 1117. The Second Circuit has held that despite this omission in 15 U.S.C. Sec. 1117(a), the award of prejudgment interest is within the discretion of the trial court. *See Am. Honda Motor Co. v. Two Wheel Corp.,* 918 F.2d 1060, 1064 (2d Cir.1990) (affirming denial of request for prejudgment interest). The award of such interest is reserved for exceptional cases. *See id.* (citing *Champion Spark Plug Co. v. Sanders,* 108 F.Supp. 674 (E.D.N.Y.1952), *aff'd,* 204 F.2d 125 (2d Cir.1953)). A case is not exceptional simply because there has been willful infringement. *See Mister Softee, Inc. v. Boula Vending Inc.,* 10cv2390, 2011 WL 705139, *aff'd,* 484 Fed.Appx. 623 (2d Cir.2012). Statutory damages awarded under the Lanham Act serve as a punishment and as a deterrent to future trademark infringement. They are not the return of monies to which a plaintiff had a prior claim but of which the plaintiff had been deprived such that prejudgment interest would properly serve to recompense the plaintiff for the deprivation of the opportunity to invest the monies had they been in its possession earlier. Given that I have recommended that Plaintiff be awarded the enhanced damages of $10,000; that there is a punitive aspect to the recommended award of $10,000; and that the damage suffered by Plaintiff is minimal; I respectfully recommend prejudgment interest be denied.

### e. Costs

Plaintiff requests costs but provides no information about any costs incurred. The costs that a party may recover are set forth in 28 U.S.C. Sec.1920. As the only known particular cost in this action is the

filing fee, I respectfully recommend that Plaintiff be awarded costs of $350 for its filing fee. *See, e.g., Jackson,* 826 F.Supp.2d at 454.

## 2. Request for Injunctive Relief

### a. Law

■■■ "A court may issue an injunction on a motion for a default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction." *Kingvision Pay–Per–View Ltd. v. Lalaleo,* 429 F.Supp.2d 506, 516 (E.D.N.Y. 2006) (citation & internal quotation marks omitted); *see BBY Solutions, Inc. v. Schwartz,* 11cv947, 2011 WL 6986937, at *2 (E.D.N.Y. Nov. 17, 2011). Traditionally, in order to obtain a permanent injunction in a trademark action the moving party was required to establish (1) success on the merit—that it has suffered an irreparable injury; (2) that no adequate remedy at law existed to compensate the plaintiff; and (3) that irreparable harm would result if an injunction did not issue. *See Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings. Inc.,* 800 F.Supp.2d 515, 539 (S.D.N.Y. 2011). In light of *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), however, courts now also require a showing that (4) the balance of hardships favors the movant and (5) the public interest would not be disserved by the injunction. *See Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.,* 11cv9321, 2012 WL 5177517, at *4 (S.D.N.Y. Oct. 18, 2012); *Coach, Inc. v. O'Brien,* No. 10cv6071, 2012 WL 1255276, at *17 (S.D.N.Y. Apr. 13, 2012).

■■■ "In the realm of trademark infringement and unfair competition, permanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in the future." *A.V. By Versace, Inc. v. Gianni Versace S.p.A.,* 96cv9721, 2005 WL 147364, at *5 (S.D.N.Y. Jan. 24, 2005) (citation & interior quotation marks omitted); *see Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 772 (2d Cir.1984) (same); *see also Collins v. Aztar Corp.,* 210 F.3d 354, 354 (2d Cir.2000) (same); *cf. SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir.1972) (injunction unnecessary if there is no reasonable likelihood that the conduct at issue will be repeated). In the related realm of copyright infringement, the United States Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *eBay Inc.,* 547 U.S. at 393–94, 126 S.Ct. 1837. "[T]he irreparable injury ... was not intended to swallow the remaining prongs of the permanent injunction inquiry." *Gucci Am., Inc. v. Daffy's Inc.,* 354 F.3d 228, 236–37 (3d Cir.2003).

The burden is on the plaintiff to establish its entitlement to an injunction, and the complaint and supporting record must make out each of the factors needed to obtain such relief. *Compare Chanel, Inc. v. Louis,* 06cv5924, 2009 WL 4639674, at *5 (E.D.N.Y. Dec. 7, 2009) ("[b]ecause plaintiffs have shown that their protected marks and copyrights continue to be marketed on [a website], a threat of continuing infringement exists," the court awarded an injunction); *with Bill's Birds Inc. v. Trademarketing Resources Inc.,* 920 F.Supp.2d 357, 364 (E.D.N.Y.2013); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co.,* 7cv2568, 2012 WL 1414872, at *5 (E.D.N.Y. Jan. 20.2012); *Western Supreme Buddha Ass'n Inc. v. Oasis World Peace & Health Foundation,* 08cv1374, 2010 WL 3488134, at *3–*4 (N.D.N.Y. Aug 10, 2010).

In order to determine whether an injunction should issue, we evaluate the record in light of the five elements needed to support such a request.

### i. Success On The Merits

On the question of the success on the merits, Plaintiff meets this standard because liability has been determined in its favor. This is a strong factor in favor of issuing an injunction.

### ii. Lack Of An Adequate Remedy At Law

■■■■■ "In the absence of assurances in the record against a defendant's continued infringing activity, a remedy at law may be deemed insufficient to compensate a plaintiff for [its] injuries." *AW Indus., Inc. v. Sleepingwell Mattress Inc.*, 10cv4439, 2011 WL 4404029, at *11, 2011 U.S. Dist. LEXIS 111889, at *32 (E.D.N.Y. Aug. 31, 2011) (quoting *Eu Yan Sang Int'l Ltd. v. S & M Enters. (U.S.A.) Enter. Corp.*, 09cv4235, 2010 WL 3824129, at *4 (E.D.N.Y. Sept. 8, 2010), *adopted by*, 2010 WL 3806136, 2010 U.S. Dist. LEXIS 99796 (E.D.N.Y. Sept. 23, 2010)); *see also Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 553 (S.D.N.Y.2008). A defendant's refusal to appear in this action demonstrates the inadequacy of plaintiff's remedies at law. *See AW Indus.*, 2011 WL 4404029, at *10–11, 2011 U.S. Dist. LEXIS 111889, at *32. Given that Plaintiff's request is to prevent the undermining of its trademark and service marks that build upon its 60–plus–year valuable reputation, Plaintiff requires an injunction to minimize the harm that it may suffer because of Defendant's action.

### iii. Irreparable Harm

■■■■■ In a trademark infringement case, "a plaintiff can establish a risk of irreparable harm by showing a 'likelihood of confusion as to source or sponsorship.'" *AW Indus.*, 2011 WL 4404029, at *10, 2011 U.S. Dist. LEXIS 111889, at *30 *adopted by*, 2011 WL 4406329, 2011 U.S. Dist. LEXIS 106308 (E.D.N.Y. Sept. 21, 2011) (*quoting Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia S.P.A.*, 847 F.2d 53, 55 (2d Cir.1988)). "Plaintiff need only raise a serious question of likelihood of confusion." *AW Indus.*, 2011 WL 4404029, at *10, 2011 U.S. Dist. LEXIS 111889, at *30 (citation omitted). In a trademark infringement case, "irreparable injury is established where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Lobo Enters., Inc. v. Tunnel, Inc.*, 822 F.2d 331, 333 (2d Cir.1987) (internal quotation marks & citation omitted); *see Rolls–Royce PLC v. Rolls–Royce USA, Inc.*, 688 F.Supp.2d 150, 159 (E.D.N.Y.2010); *Garis v. Uncut–RawTV, Inc.*, 06cv5031, 2011 WL 4404035, at *6 (E.D.N.Y. July 5, 2011).

In this case, the District Court's award of a judgment of liability has made the legal determination that Plaintiff has suffered irreparable harm because of the infringement. We review the same factors in order to determine whether there is a likelihood of future harm.

### 1. Use Of The Trademark

In order to justify damages in an infringement case, there must be some unlawful use. The "use" at issue in a trademark infringement injunction request is that "use" defined in the Lanham Act. The plain language of Sections 32 and 43(a) of the Lanham Act requires that a defendant have used the protected mark in commerce for there to be a violation. The phrase "use in commerce," as it relates to claims pled under Sections 32 and 43(a) of the Lanham Act, is defined in 15 U.S.C. Sec. 1127. *See Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 110 (2d Cir.2010).

In brief, "[a] mark is 'deemed to be in use in commerce' when 'it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale,' and the goods are transported or sold in commerce." *GMA Accessories, Inc. v. BOP, LLC*, 765 F.Supp.2d 457, 463 (S.D.N.Y. 2011) (citing 15 U.S.C. Sec. 1127). "A mark can also be used in commerce 'on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.'" *Id.* In the present case, Plaintiff's primary concern is with the "services" aspect of the statute.

■ To state the obvious, "use" under the statute requires actual use before relief can be granted to a plaintiff claiming infringement. *See GMA Accessories, Inc.*, 765 F.Supp.2d at 463–64; *Int'l Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F.Supp.2d 365 (S.D.N.Y. 2007); *see Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 672 F.Supp.2d 106, 109, 111 (D.D.C.2009).

The evidence here of use is scan—the certificate of incorporation and the hearsay statement that a truck at Defendant's location had carpet tools in it. What is troubling is that according to Plaintiff's sworn statements, despite their extensive industry contacts and investigation, they cannot determine whether Defendant is using the mark in business. We thus must focus on what we have been shown to be a continuing "use" by Defendant—the certificate of incorporation. We note that there is no evidence in the record that Defendant has cancelled its New York State certificate of incorporation. We also take judicial notice of a search of the New York State Secretary of State database of New York State-registered corporations that showed that the entity Stark Carpet & Flooring Installations, Corp. is still an active domestic business corporation in New York State. *See* http://www.dos.ny.gov/corps/bus_entity_search.html (Feb. 20, 2013).

At least three courts have found that the act of incorporation of a competing mark and service with the intent to enter the same line of business as the markholder can trigger the trademark protection statute. In *Blum's of San Francisco, Inc. v. Blum's of N.Y.C., Inc.*, 174 U.S.P.Q. 32, 33 (S.D.N.Y.1972), the defendant had incorporated in New York but had not begun operations at the time of the infringement action. Its certificate of incorporation described a business that was similar to the plaintiff's, and at oral argument, counsel confirmed the defendant's intention to enter the business. *Id.* In *Blum's*, the court noted that the plaintiff would be entitled to injunctive relief if it could prove secondary meaning plus likelihood of confusion, which it did. *Id.* In *Magic Pan, Inc. v. Magic Pan, Inc.*, 185 U.S.P.Q. 528, 529 (S.D.Ind. 1975), the defendant's incorporation and proposed use of the plaintiff's federally registered name and mark was an infringement where the defendant's conduct prevented the plaintiff from obtaining in-state permission to do business as a foreign corporation. *See also LeFebure Corp. v. Lefebure, Inc.*, 284 F.Supp. 617, 620–21 (D.C.La.1968) (citing cases) (defendant's multi-state incorporation with confusingly similar trade name along with stated intention to use marks to gain leverage in negotiation with plaintiff as to certain deals was infringing use).

■ Here, the corporate formation and continued existence of a New York State corporation with an almost identical name and description of business establishes "use in commerce," if barely.

### 2. Likelihood Of Confusion

In considering the question of consumer-confusion, a court asks "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir.2009); *see TechnoMarine SA v. Jacob Time, Inc.*, 905 F.Supp.2d 482, 488–90 (S.D.N.Y.2012). To make this evaluation, the Second Circuit requires the application of an eight-factor balancing test. *See Starbucks Corp.*, 588 F.3d at 115 (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961)). The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. *See, e.g., Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir.2005) (dealing with infringement allegations in the context of products); *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 138 (2d Cir.1999) (dealing with infringement allegations in the context of services). The analysis is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products [or services] in their totality, consumers are likely to be confused." *Star Indus.*, 412 F.3d at 384.

### a. Factor One: Strength Of The Mark

"The strength of a trademark encompasses two different concepts, both of which relate significantly to likelihood of consumer confusion. The first is inherent strength, also called 'inherent distinctiveness.'" *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir.2003). This category of marks tends to uniquely identify a product's or service's source, as opposed to simply describing what is for sale. *Id.* The second sense of the concept of strength of a mark is "acquired distinctiveness," *i.e.*, fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition. *Id.*

Here, Plaintiff has not offered the Court any image of its mark such that there is no information as to whether the Stark mark is "inherently distinctive." *Cf. Star Indus.*, 412 F.3d at 385 (discussing the distinctiveness of the plaintiff's "O" mark). However, Plaintiff has shown an "acquired distinctiveness" in the Stark name and mark insofar as Plaintiff has been operating continuously for over sixty years in New York and now has clients around the globe. *See* Compl. ¶¶ 6–8, 11. As Plaintiff has presented the Court with an uncontested sworn statement by its general manager that its mark has become synonymous with high quality in its market, its mark seems to be distinctive and strong. *Id.; see generally* Haleman Dec. This factor weighs in Plaintiff's favor.

### b. Factor Two: Similarity Of Marks

The similarity of marks is measured by the degree to which they are similar. *See McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir.1979). While courts gauging the similarity of marks have at times compared the typeface and the color of an image, other courts have recognized that too much emphasis on image is problematic in measuring the similarity of marks, as a great deal of commerce occurs via word-of-mouth where a spoken infringing name alone establishes sameness. *See Hills Bros. Cof-*

*fee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 381 (2d Cir.1970) (observing that when products are discussed on the radio or through word of mouth, "distinctive labels will be absent" and similar product names will make "confusion virtually certain").

Plaintiff's name Stark Carpet Corp. and Defendant's name Stark Carpet & Flooring Installations, Corp. are not merely similar: They are identical to the extent that both consist of the same words, "Stark Carpet." *See Virgin Enter. Ltd.*, 335 F.3d at 149. The consuming public would not likely be able to distinguish between the two companies' names. This factor weighs in favor of finding a likelihood of consumer confusion.

### c. Factors Three And Four: Proximity Of The Products And Likelihood Of Bridging The Gap

The proximity of the products (or services) and the likelihood of bridging the gap have "an obvious bearing on the likelihood of confusion." *Virgin Enter. Ltd.*, 335 F.3d at 150. "The closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480–81 (2d Cir.1996). Even if the products or services are not so close to one another, a corollary question becomes whether there is a likelihood, given the prior user's operations, that it would "in the reasonably near future begin selling those products." *Id.* at 482.

Plaintiff's best evidence here is the New York State certificate of incorporation, coupled with the fact that Defendant remains a registered New York State domestic corporation as of this month. This document shows that Defendant's registration was made with the purpose of being in the floor covering market, in which Plain-tiff has been and in which Plaintiff has been expanding. Compl. ¶¶ 6–8. This evidence is undermined somewhat by Plaintiff's admission that it does not know if Defendant is using the mark in the marketplace. *See* Krasner Aff. ¶ 14. Given that both companies represent to the public that they engage in carpet installation under the name "Stark Carpet", it is reasonable to weigh these factors in Plaintiff's favor.

### d. Factor Five: Evidence Of Actual Consumer Confusion

If consumers have been exposed to similar trademarks in the marketplace for a period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, "that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir.1999). "Hence, evidence of actual consumer confusion is particularly relevant to a trademark infringement action." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir.1998).

It should come as no surprise that Plaintiff has not provided the Court with any evidence of actual consumer confusion, given Plaintiff's statements that it does not know if Defendant uses the Stark mark in commerce. The absence of such information is particularly notable in this case given Plaintiff's repeated statements about its depth of experience and knowledge of the carpet business, and its efforts to find some information about Defendant's alleged operations. *See* Compl. ¶¶ 6–8. The fifth factor—consumer confusion—weighs strongly against Plaintiff.

### e. Factor Six: Evidence That The Imitative Mark Was Adopted In Bad Faith

The bad faith factor looks at whether defendant "adopted its mark with

the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [its] and the senior user's product" or services. *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991). This intentionality was on display in *Tecnimed SRL v. Kidz–Med, Inc.*, 763 F.Supp.2d 395, 408 (S.D.N.Y.2011), *aff'd*, 462 Fed.Appx. 31 (2d Cir.2012), where the defendant, *inter alia*, issued a press release linking it with the actual markholder and used testimonials about the actual markholder in its own promotional materials. Courts have recognized that in the absence of smoking gun evidence that a defendant adopted an imitative mark to deceive, "deliberate copying may indicate that the defendant acted in bad faith." *Starbucks Corp.*, 588 F.3d at 118 (citing to *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 587 (2d Cir.1993)). However, a court is not required to draw that inference, and without such evidence or with evidence to the contrary, may come to a different conclusion. *See, e.g., Starbucks Corp.*, 588 F.3d at 118; *Streetwise Maps*, 159 F.3d at 745–46.

Plaintiff alleges that Defendant "adopted the name and mark 'STARK' with full knowledge of Plaintiff's ownership of THE MARKS as well as other marks in Plaintiff's family of 'STARK' marks and with the intention of trading off in the goodwill built up by Plaintiffs therein." Compl. ¶ 14. As Plaintiff's factual allegations are uncontested, the Court takes as true that Defendant adopted the Stark mark in bad faith. This assumption seems

merited given Defendant's default, the exceptional similarity of the marks and the lack of any evident justification for the choice of the similar name.[4]

### f. Factor Seven: Respective Quality Of The Products

Given the lack of any information about Defendant providing any services in Plaintiff's market, or any other market, there is no Defendant product or service such that a quality comparison can be made. Based on Plaintiff's own allegations, however, it believes that were Defendant to provide services, they would be of a lower-end of quality than the services that it provides. Thus, factor seven weighs against a finding of likely consumer confusion. *See, e.g., Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 Fed.Appx. 615, 619 (2d Cir.2008) (disagreeing with district court that quality-of-product factor favored plaintiff, but finding overall *Polaroid* factors did favor plaintiff); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir.2007) (unlikely to be any confusion between high-end luxury handbags and dog chew toy parodying high end products).

### g. Factor Eight: Sophistication Of Consumers In The Relevant Market

An analysis of consumer sophistication considers "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390. Although consumer sophistication in a par-

---

**4.** As the Second Circuit said more than a century ago:

It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods than those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them. *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F. 73, 73 (2d Cir.1910).

ticular market may be shown by expert opinions or surveys, *id.,* in certain cases a court may draw conclusions about consumer sophistication based on the nature of the product or its price. *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 219 (2d Cir.2003). In *Patsy's Brand,* the Second Circuit endorsed the district court's view that purchasers of pasta at the supermarket were "ordinary consumers of inexpensive retail products," and drew the conclusion that in that buying context, they were not likely to make a sophisticated, careful analysis of the products. *Id.* at 219. Similarly, in *Lever Brothers Co. v. Am. Bakeries Co.,* 693 F.2d 251, 259 (2d Cir.1982), the court stated that the "ordinary purchaser of bread and margarine is a casual buyer, and the bustling, self-service atmosphere of a typical supermarket makes casual examination of products unlikely." The takeaway from *Patsy's Brand* and *Lever Brothers Co.* is that buyer sophistication is low "where inexpensive products are involved." *Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755, 762 n. 19 (2d Cir.1960). Conventional wisdom would hold that the opposite is true, *i.e.,* that buyer sophistication is high when expensive products are involved.

Here, Plaintiff describes in some detail its reputation as a world-class seller of "high-end luxury design products" such as floor covering goods and services. Compl. ¶¶ 6–9. It claims that its products are advertised in the country's prestigious design and style publications such as *Architectural Digest* and *The New York Times. Id.* ¶ 8. Plaintiff's own description of its customers includes the "world's most well known design professionals" who frequent its New York showrooms. It seems unlikely that such sophisticated consumers of luxury goods are likely to be confused between Stark operating out of the "D & D" building and Defendant operating out of the first floor of a two-family house in Corona, Queens. *See* Compl. ¶¶ 7–8; Krasner Dec. ¶ 14; *Docket Entry No. 10–1,* Ex. C. It also seems unlikely that even a novice buyer in the market for goods and services of the type sold by Plaintiff Stark would be confused by Defendant's use of the name "Stark Carpet" as the two seem to be worlds apart in quality. A consumer, or his or her agent, in the market for an expensive purchase of the goods and services sold by Plaintiff Stark would likely do sufficient research and be considered somewhat more sophisticated in his or her purchase than someone shopping for the much less expensive purchase of pasta or butter. *See, e.g., Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1111 (6th Cir.1991) ("A sophisticated purchaser exercises a high degree of care and is less likely to be confused as to a product's origin.").

The eighth factor regarding consumer sophistication in the high-end floor covering market weighs against finding consumer confusion.

### h. Balancing

On review of all of the *Polaroid* factors, five factors (strength of mark, similarity of marks, bad faith, proximity of the products/services, likelihood of bridging the gap) favor Plaintiff's contention that consumer confusion is likely. By contrast, three factors (evidence of actual consumer confusion, respective quality of the products, and sophistication of the consumer in the relevant market) do not favor a finding that there is likely consumer confusion. As the balance of the factors favor Plaintiff, the element of a likelihood of confusion required to support a trademark infringement injunction is present.

### 3. Balance of Hardships

In cases in which courts have found that infringement occurred, courts

have essentially argued that the only hardship to the defendant from the injunction would be to prevent the defendant from engaging in further illegal activity. *See, e.g., DISH Network L.L.C. v. DelVecchio,* 831 F.Supp.2d 595, 601–02 (W.D.N.Y.2011). Given that Plaintiff has offered evidence that the loss of control over its mark would cause it significant harm while there is no evidence from Defendant on this point, *id.* ¶¶ 16, 19, 26–28, the balance of hardships favors Plaintiff.

### 4. The Public Interest

██ Anti-infringement injunctions serve the public interest by preventing consumer confusion and allowing a more efficient marketplace to operate by virtue of the availability to consumers of a clear identification of products, services and vendors. This factor favors Plaintiff because of the above-discussed likelihood of consumer confusion.

### iv. An Injunction Is Merited

All of the factors in favor of an injunction weigh in Plaintiff's favor, if barely. Because of the ongoing incorporation of Defendant's business, without the injunction, Plaintiff would be required to monitor Defendant's business to determine whether it uses its mark to further its commercial interests. *See LeFebure,* 284 F.Supp. at 624. In *LeFebure,* the court stated that "Plaintiff, on the other hand, argues that it should not be required to keep the defendant under constant surveillance in order to ascertain if and when it commences to engage in business under a corporate name, the use of which plaintiff contends would constitute infringement and unfair competition.... The Court is convinced that the plaintiff's position correctly states the law applicable to this case." *Id.* The same is true here.

Accordingly, I recommend that the District Court enter an Order permanently enjoining Defendant, its officers, directors, employees, agents, servants, affiliates and any person and/or entity acting under or through Defendant from directly or indirectly:

a) infringing Plaintiff's trade name, trademarks and service marks containing the word "Stark" or words "Stark Carpet" in connection with Defendant's business;

b) using the word "Stark" or "Stark Carpet" or confusingly similar words in connection with advertising, promotion, offering or performance of any services or good related in any manner related to interior design products, including but not limited to carpets, rugs, broadloom carpeting, floor coverings, wall coverings, furniture, fabric and/or paint;

c) holding itself out as the owners of or authorized users of names or marks containing the word "Stark" or words "Stark Carpet" in any manner related to interior design products, including but not limited to carpets, rugs, broadloom carpeting, floor coverings, wall coverings, furniture, fabric and/or paint;

d) performing or engaging in any actions or use of the word "Stark" or the words "Stark Carpet" which is likely to cause confusion or mistake or to deceive or otherwise mislead the trade or public into believing that Plaintiff and Defendant are one in the same or in some way connected or associated; that Plaintiff is a sponsor of or otherwise controls Defendant; that Defendant is in any way affiliated with, controlled by, associated with or supervised by Plaintiff; or that Defendant's services or products originate with or are offered with the approval, consent, authorization or supervision of Plaintiff; and

e) using the word "Stark" or the words "Stark Carpet" in any way that would

create a likelihood of injury to Plaintiff's business reputation or a dilution of Plaintiff's names and marks and the goodwill associated therewith.

## IV. Service & Objections

This report and recommendation will be filed electronically and a copy sent by mail to Defendants on this date. Any objections must be filed with the Clerk of the Court, with a copy to District Judge Gershon and the other party within fourteen days of the date of this Order. *See* 28 U.S.C. Sec. 636(b)(1); Fed.R.Civ.P. 72; *see also* Fed.R.Civ.P. 6. Failure to file timely objections may waive the right to appeal the District Court's Order. Any request for an extension of time to appeal must be made to District Judge Gershon.

Dated: Brooklyn, New York, February 25, 2013.